**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**RENO, NEVADA**

| | |
|---|---|
| KERZNER INTERNATIONAL LIMITED, and ) KERZNER INTERNATIONAL RESORTS, ) INC., ) )     Plaintiffs, ) ) vs. ) ) MONARCH CASINO & RESORT, INC., and ) GOLDEN ROAD MOTOR INN, INC., ) )     Defendants. ) _____ ) MONARCH CASINO & RESORT, INC., and ) GOLDEN ROAD MOTOR INN, INC., ) )     Counterclaimants, ) ) vs. ) ) KERZNER INTERNATIONAL LIMITED, and ) KERZNER INTERNATIONAL RESORTS, ) INC., ) )     Counterdefendants. ) _____ ) | 3:06-CV-232-ECR-RAM **Order** |

This case is a trademark infringement action relating to the "Atlantis" mark used by Plaintiffs/Counterdefendants Kerzner International Limited and Kerzner International Resorts, Inc. ("Kerzner") at a casino resort located on Paradise Island in The Bahamas, and by Defendants/Counterclaimants Monarch Casino & Resort, Inc. and Golden Road Motor Inn, Inc. ("Monarch") at a casino resort in Reno, Nevada. On November 12, 2009, we held a hearing regarding

the many motions that are pending in this case.  In this order, we will rule on several of those motions, specifically, four motions for partial summary judgment (## 277, 279, 299, 310) filed by Monarch.  The remaining motions still pending will be addressed in a separate order.

## I. Background

The Atlantis mark was first registered for lodging services by Atlantis Lodge, Inc. ("Lodge") on October 11, 1994 (U.S. Registration No. 1,857,994).  Lodge has used the Atlantis mark for lodging services in North Carolina since June 6, 1963.  The present case has its roots in the circumstance that Lodge separately licensed the Atlantis mark to both Kerzner and Monarch.[1]

Monarch has been offering lodging services in Reno, Nevada since 1972 and casino services since 1986.  Monarch began using the Atlantis mark in connection with restaurant, bar, lounge, and nightclub services — but not lodging or casino services — in 1992.  On February 3, 1996, Monarch entered into a license agreement with Lodge for use of the Atlantis mark.  The agreement entitled Monarch to use the Atlantis mark in connection with lodging services provided at Monarch's Reno casino resort, which had previously operated under the "Clarion" mark, and granted Monarch exclusive use of the Atlantis mark for lodging services in all of Nevada, as well as the right to advertise those services.  In April 1996, Monarch's

---

[1] In this order, we will generally use the terms "Kerzner" and "Monarch" to refer to the parties collectively, as well as their respective predecessors-in-interest and subsidiaries, except where the distinctions are specifically relevant.

2

entire Reno facility began operating under the Atlantis mark, adopting the name "Atlantis Casino Resort."  In July 1997, Monarch obtained a Nevada state trademark registration for the mark "Atlantis Casino Resort" for casino services, which it has since renewed several times.  Monarch did not at any time, however, seek federal registration of the Atlantis mark for casino services.

On October 13, 1994, Kerzner entered into a license agreement with Lodge for use of the Atlantis mark at its casino resort in The Bahamas and in advertising in the United States.  The facility had previously operated as the "Paradise Island Resort and Casino." Kerzner adopted the Atlantis mark in 1994: the advertising campaign for the grand reopening of Kerzner's casino resort under its new name, "Atlantis, Paradise Island," began in October 1994, and the reopening actually occurred in December 1994.

On July 29, 1996, Kerzner entered into an assignment and license agreement with Lodge.  Under this agreement, Kerzner acquired the registered Atlantis mark for lodging services from Lodge and licensed the mark back to Lodge for use in North Carolina. The license agreement between Monarch and Lodge was attached as an exhibit to the Lodge/Kerzner assignment agreement, and Lodge's representations of its right to assign an interest in the Atlantis mark were made subject to Monarch's exclusive license to use the mark for lodging services in Nevada.

In February 1997, Kerzner applied for federal registration of the Atlantis mark for, among other things, casino services by filing an "intent to use" application with the United States Patent and Trademark Office ("USPTO").  Registration No. 2,810,825 ("'825

Registration") was issued to Kerzner on February 3, 2004, after Kerzner filed a Statement of Use in September 2003, claiming a first use date of October 1994.

While the parties were simply operating their respective businesses in The Bahamas and in Reno, their uses of the Atlantis mark did not lead to dispute.  Indeed, Kerzner has no quarrel with Monarch's continued use of the Atlantis mark at its Reno casino resort.  The parties' respective plans for expansion, however, have collided in Las Vegas.  Each alleges that the other has taken at least some steps towards creation of a casino resort in Las Vegas under the Atlantis mark — either by the party itself or by licensing the mark to a third party — in violation of their respective trademark rights.

Kerzner initiated the present lawsuit by filing its Complaint (#1) on January 27, 2006.  Kerzner filed an Amended Complaint (#5) on February 14, 2006.  Kerzner's Amended Complaint asserts six claims for relief: (1) Declaratory Judgment Pursuant to Section 32(1) of the Lanham Act (trademark infringement); (2) Declaratory Judgment Pursuant to Section 43(A) of the Lanham Act (likelihood of confusion, mistake, or deception); (Declaratory Judgment Pursuant to Section 43(C) of the Lanham Act (dilution of a famous mark); (4) Declaratory Judgment Pursuant to Common Law Trademark Infringement and Unfair Competition; (5) Dilution Pursuant to Nevada Law (Nev. Rev. Stat. § 600.435); and (6) Deceptive Trade Practices Pursuant to Nevada Law (Nev. Rev. Stat. §§ 41.600 and 598.0915).  Kerzner no longer presses its third, fifth, and sixth claims, however, and our

4

1  Minute Order (#425) granted Monarch summary judgment on those
2  claims.

3      Monarch's Amended Answer and Counterclaims (#56) was filed on
4  December 28, 2006.  Monarch denied each of Kerzner's claims for
5  relief, asserted various defenses, and also asserted eight
6  counterclaims for relief[2]: (1) Cancellation of the Fraudulently
7  Obtained '825 Registration; (2) Breach of License Agreement; (3)
8  Indemnification Under the License Agreement; (4) Declaratory Relief
9  Pursuant to Claim for Trademark Infringement; (5) Declaratory Relief
10  that Counterclaimants Have Developed Valid Common Law Rights in an
11  ATLANTIS Mark for Casino Services; (6) Declaratory Relief that
12  Counterclaimants Own A Valid Nevada State Trademark for Casino
13  Services under N.R.S. § 600.050 et seq.; (7) Declaratory Relief
14  Pursuant to Claim for Trademark Infringement Under N.R.S. § 600.050
15  et seq.; and (8) Declaratory Relief Pursuant to Claim for Deceptive
16  Trade Practices.  Six of the eight counterclaims remain in the case;
17  Kerzner's motion (#69) to dismiss Monarch's second and third
18  counterclaims was granted by the Court.  (<u>See</u> Mins. of June 29,
19  2007, Hr'g (#121).)

20
21              **II. Summary Judgment Standard**

22      Summary judgment allows courts to avoid unnecessary trials
23  where no material factual dispute exists.  <u>N.W. Motorcycle Ass'n v.</u>
24  <u>U.S. Dep't of Agric.</u>, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court

25
_____

26      [2] Monarch sought leave to file a second amended answer and
   counterclaims to add ninth and tenth counterclaims, but we denied
27  Monarch leave to do so.  (<u>See</u> Mins. of June 29, 2007, Hr'g (#121).)

28                              5

must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED. R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

6

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary judgment is not proper if material factual issues exist for trial.  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  Disputes over irrelevant or unnecessary facts should not be considered.  Id.  Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  Id.

### III. Monarch's Motion (#277) Re. Priority of Use

Monarch has filed a motion entitled "Defendants/Counterclaimants' Motion for Partial Summary Judgment that Monarch has Priority of Use of the 'Atlantis' Mark for Casino Services in the United States" (#277).  Kerzner opposed (#346) the motion, and Monarch replied (#371).

There are two fundamental principles of trademark law at issue in Monarch's motion: priority of use and the territoriality

7

principle.  Ordinarily, the principle of first in time equals first in right applies in trademark law; trademark rights come from "earlier use of a mark in commerce."  Grupo Gigante SA de CV v. Dallo & Co., Inc., 391 F.3d 1088, 1093 (9th Cir. 2004).  "It is 'not enough to have invented the mark first or even to have registered it first.'"  Id. (quoting Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1271, 1219 (9th Cir. 1996)).  Priority of trademark rights in the United States, however, generally "depends solely on priority of use in the United States, not on priority of use anywhere else in the world."  Id. (internal quotation marks omitted).  "Earlier use in another country usually just does not count."  Id.

A. The Parties' Dates of First Use

Monarch argues that its use of the Atlantis mark for casino services dates back to 1992, when it first began using the mark in connection with restaurant services.  This date is well before Kerzner began to use the Atlantis mark in The Bahamas, let alone in the United States.  Under the "related goods" or "natural expansion" doctrine, use of a mark in connection with one good or service could also give priority of use in connection with a second good or service, if the two are closely related.  See, e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1051 (9th Cir. 1999); Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1310 (11th Cir. 1999); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:20 (4th ed. 2009) (describing this doctrine as "an unnecessarily complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation").  Monarch's idea here is

that, at least in Nevada, it is natural to expect that a business using a mark for restaurant services would expand into use of the mark for casino services. (D.'s Reply at 12-13 (#371).)

There does not appear to be any authority, however, that supports Monarch's assertion that restaurant services and casino services should be considered closely related. To the contrary, at least one court has explicitly rejected very similar arguments. <u>See Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.</u>, 80 F. Supp. 2d 815, 881 (N.D. Ill. 1999) (finding that restaurant services are not closely related to casino services). Monarch asserts that <u>Planet Hollywood</u> should be distinguished on its facts, citing the "uniqueness of the Nevada gaming marketplace." (D.'s Reply at 13 (#371).) Even in Nevada, however, the vast majority of restaurants, bars, lounges and nightclubs do not expand into the casino business. <u>See Planet Hollywood</u>, 80 F. Supp. 2d at 882 (finding no likelihood of consumer confusion on a similar basis). Such an expansion is not an unprecedented occurrence, but Monarch's expert could cite only six of 270 casinos in Nevada with revenue of more than a million dollars that started out as restaurants. (Wells Dep., PX 72 at 40:16-41:3 (#334-86); Wells Report, D's Ex. C65 at 5-3, 5-4 (#367-71).) The percentage of restaurants that later expand into casinos is surely even smaller. Thus, we conclude that restaurant services and casino services are not closely related, even in Nevada. Monarch only began to develop trademark rights in the Atlantis mark for casino services when it actually began using the mark in connection with casino services in April 1996.

Kerzner claims first use of the Atlantis mark as of October 1994, based on the beginning of the advertising campaign for the re-opening of its casino resort under the Atlantis mark.  Kerzner did not begin to use the Atlantis mark in connection with casino services, as opposed to merely advertising for casino services, until December 1994.  Trademark rights, however, "can vest even before any goods or services are actually sold if 'the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark." Brookfield, 174 F.3d at 1052 (quoting New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1200 (9th Cir. 1979)); see also Hotel Corp. of Am. v. Inn Am., Inc., 153 U.S.P.Q. 574, 576 (T.T.A.B. 1967) (noting that a hotel could acquire priority of use prior to opening if the use in connection with advertising or promotional material in advance of opening was "of such nature and extent as to create an association of the goods or services and the mark with the user thereof").  Here, however, we need not engage in the analysis necessary to determine whether Kerzner's promotional campaign alone was sufficient to establish a right to use the mark: the difference between October 1994 and December 1994 as Kerzner's priority of use date is not material to any issue now before the Court, so we may start our analysis with the later date.

Monarch has challenged whether Kerzner adopted the Atlantis mark in connection with casino services even in December 1994, suggesting instead that Kerzner then adopted "Atlantis, Paradise Island" as the name of the entire resort, but continued to operate the casino at that resort only under the name "Paradise Island Casino."  (Hr'g Tr. 26-35 (#427).)  This argument is without merit.

It is undisputed that Kerzner adopted the Atlantis mark for its casino resort as a whole beginning in December 1994, upon the facility's reopening under its new name.  Monarch itself makes arguments in other contexts that implicitly depend on the premise — which Kerzner does not dispute — that it would be impractical, if not impossible, to operate a casino resort under one name for the whole facility, while operating the associated casino solely under a different name.  (See D.'s Reply at 5 (#373) (asserting that "[w]ithout the ability to offer lodging services in Nevada under the mark, Kerzner does not have the ability to use any federal rights it claims in casino services under the Atlantis name in the state").) The scant evidence to which Monarch has pointed in support of the notion that Kerzner nonetheless has attempted to do so is insufficient to raise a genuine issue of material fact on this issue.  At best, Monarch has demonstrated that the Paradise Island mark continued to be used in some respects at Kerzner's casino for some period of time after December 1994, a circumstance which, even if true, would not nullify Kerzner's concurrent use of the Atlantis mark.  See Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 800 (9th Cir. 1970) (noting that "a product can bear more than one trademark"); see also Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 435 (7th Cir. 1999) (same); Loonen v. Deitsch, 189 F. 487, 493 (2d Cir. 1911) (finding "that there is no objection to as many trade-marks as the trade will in fact assimilate").  We will, therefore, use December 1994 as Kerzner's date of first use in our analysis.

B. The Territoriality Principle

     Monarch argues that, even if Kerzner began to use the Atlantis mark for casino services in December 1994 and Monarch only adopted the mark in April 1996, Monarch still prevails here under the territoriality principle.  Kerzner's "Atlantis, Paradise Island" is located in The Bahamas, and Kerzner does not operate any similar facility in the United States.  Thus, Monarch argues, Kerzner could not be the senior user of the Atlantis mark for casino services in the United States.

     Kerzner presents three alternative arguments in opposition. First, Kerzner asserts that, though the casino owned and operated by Kerzner is located outside of the United States, functions integral to the operation of that casino are performed by Kerzner in the United States under the Atlantis mark.  Kerzner argues that such use gives rise to trademark rights under the reasoning of <u>Penta Hotels Ltd. v. Penta Tours</u>, 9 U.S.P.Q.2d 1081, 1094 (D. Conn. Sep. 30, 1988).  Second, Kerzner cites a Fourth Circuit case, <u>International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco</u>, 329 F.3d 359 (4th Cir. 2003), for the notion that use of a mark in advertising or sale of services in the United States, coupled with the rendering of those services abroad to United States citizens, is sufficient to give rise to trademark rights in the United States.  Finally, Kerzner invokes a Ninth Circuit case, <u>Grupo Gigante</u>, 391 F.3d at 1088, for the proposition that Kerzner's use of the Atlantis mark falls under an exception to the territoriality principle for well-known or famous foreign marks.  Under any of these theories, Kerzner argues, Monarch's first use of the Atlantis

12

1  mark for casino services in April 1996 is too late to give Monarch
2  priority of use.  We will examine each of these arguments
3  separately.

4         1. Kerzner's Use of the Atlantis Mark in the United States

5      For a service mark to qualify for trademark protection under
6  the Lanham Act, the mark must be "used in commerce."  11 U.S.C. §
7  1127.  A mark is "deemed to be used in commerce . . . (2) on
8  services when it is used or displayed in the sale or advertising of
9  services and the services are rendered in commerce, or the services
10 are rendered in more than one State or in the United States and a
11 foreign country and the person rendering the services is engaged in
12 commerce in connection with the services."  Id.

13     As noted above, it is undisputed that Kerzner does not operate
14 a casino in the United States.  Kerzner asserts, however, that its
15 United States operations include "the taking of, making and
16 confirming reservations for casino patrons, casino sales, casino
17 comps and casino junkets, as well as the marketing and advertising
18 of the brand and the resort in the United States for its prospective
19 United States customers."  (P.'s Opp. at 45 (#346).)  "Casino
20 accounting, casino treasury, [and] casino credit" activities are
21 apparently also a part of Kerzner's United States operations.  (Id.
22 at 44.)  Kerzner argues that these activities conducted under the
23 Atlantis mark, which it claims are "integral" to providing casino
24 services, constitute use of the mark in commerce in the meaning of
25 the Lanham Act: "'Use' of a mark in interstate commerce under the
26 Lanham Act may be established through the physical presence of
27 offices in the United States that perform commercial activities that
28

13

are an integral part of the service in question, even if the bricks-and-mortar aspect of the service . . . is located outside the Untied States."  (Id. (citing Penta Hotels, 9 U.S.P.Q.2d at 1094).)

Many of the services that Kerzner claims constitute activities integral to casino services are more properly considered to be integral to lodging or hotel services: "the taking of, making and confirming reservations for casino patrons, casino sales, casino comps and casino junkets" (id.) appear to boil down to providing hotel rooms to customers, rather than something more directly constituting casino services, like running a blackjack table. "[C]asino accounting, casino treasury, [and] casino credit" activities (id. at 44), however, are somewhat more plausibly considered integral to providing casino services.

Nevertheless, Kerzner's reliance on Penta Hotels is misplaced. In that case, the court found that the plaintiffs had rendered "hotel services" in the United States by taking and confirming reservations for hotels physically located in New York — first for an affiliated hotel, Barbizon, which was advertised as a member of the Penta chain, and later for a hotel named "the New York Penta" — in addition to taking and confirming reservations for Penta hotels located in Europe.  Penta Hotels, 9 U.S.P.Q.2d at 1094-95.  In Penta Hotels, it is the combination of activities integral to hotel services plus the providing of actual hotel rooms in the United States that were found to constitute use in commerce under the Lanham Act.  Id.  Even if certain language in Penta Hotels could be read as Kerzner urges when taken out of context, to adopt such a view of the use in commerce requirement would be contrary to the

14

principle, well established and recently reiterated in emphatic terms by the Ninth Circuit, that activity outside the United States normally does not create trademark rights within the United States. Grupo Gigante, 391 F.3d at 1093 ("Earlier use in another country usually just does not count.").

    We conclude that the activities Kerzner claims to conduct in the United States under the Atlantis mark could not alone constitute use in commerce in connection with casino services in the United States, no matter how integral those activities may be to running a casino physically located abroad.  The actual casino services provided by Kerzner abroad usually would not "count" under the territoriality principle.  International Bancorp and Grupo Gigante describe two possible exceptions, however, to the territoriality principle.  We will now consider of each of these exceptions.

        2. International Bancorp

    In International Bancorp, a majority of a three-judge Fourth Circuit panel, over a strong dissent, found that use of an unregistered mark in connection with casino services provided to United States citizens at a casino in Monte Carlo, coupled with advertising of those services in the United States, satisfied the Lanham Act's use in commerce requirement.  329 F.3d at 370.  The majority reasoned as follows: (1) the casino had used the mark in the sale and advertising of its services in the United States, as well as actually providing those services to United States citizens at the casino in Monte Carlo; (2) the rendering of such services abroad to United States citizens constitutes foreign trade; and (3) the Lanham Act defines "commerce" as "all commerce which may

15

1  lawfully be regulated by Congress," which includes foreign trade.

2  See id.

3     Kerzner argues that under International Bancorp it established

4  use in commerce of the Atlantis mark when it adopted the mark for

5  its casino resort in The Bahamas and began rendering casino services

6  to Americans, while using the mark in advertising of those services

7  in the United States.  Kerzner is correct — under International

8  Bancorp, it has established priority of use.  Indeed, the factual

9  situation here is identical to that of International Bancorp in most

10 relevant respects.

11    International Bancorp is not, however, controlling precedent in

12 the Ninth Circuit.  The Ninth Circuit has acknowledged the existence

13 of International Bancorp, but explicitly declined to consider

14 adopting the Fourth Circuit's reasoning since the parties in the

15 case before it had not raised the question.  Grupo Gigante, 391 F.3d

16 at 1094.  The Ninth Circuit panel noted, however, that the

17 International Bancorp majority's interpretation of the Lanham Act

18 "has been called into question."  Id. at 1106 n.39.  Moreover, as

19 the International Bancorp dissent correctly notes, the majority's

20 opinion is "squarely in conflict with at least two of our sister

21 circuits, the TTAB, and all other existing authority on this issue."

22 Int'l Bancorp, 329 F.3d at 389 (Motz, J., dissenting).  That

23 "existing authority" is consistent with the statement in Grupo

24 Gigante that "use in another country usually just does not count."

25 Grupo Gigante, 391 F.3d at 1093; see Int'l Bancorp, 329 F.3d at 389-

26 94 (Motz, J., dissenting) (discussing the "existing authority"); see

27 also infra note 3.

28                                    16

1    Thus, we predict that the Ninth Circuit will decline to adopt

2 the reasoning of the <u>International Bancorp</u> majority, if and when the

3 question is squarely presented to it.  Kerzner's arguments based on

4 <u>International Bancorp</u>, therefore, are unpersuasive.

5           3. Grupo Gigante

6    Like <u>International Bancorp</u>, <u>Grupo Gigante</u> represents an

7 exception to the territoriality principle that has been explicitly

8 recognized in only one circuit, and which has been criticized by at

9 least some other courts.  <u>See, e.g.</u>, <u>ITC Ltd. v. Punchgini, Inc.</u>,

10 482 F.3d 135, 164 (2d Cir. 2007) (declining to follow <u>Grupo

11 Gigante</u>).  <u>Grupo Gigante</u>, however, is a Ninth Circuit case, and thus

12 is binding precedent here.  Kerzner argues in the alternative to its

13 arguments under <u>Penta Hotels</u> and <u>International Bancorp</u> that it is

14 entitled to trademark protection under <u>Grupo Gigante</u>.

15    In <u>Grupo Gigante</u>, the Ninth Circuit held "that there is a

16 famous mark exception to the territoriality principle."  391 F.3d at

17 1094.  No circuit court had ever recognized such an exception, but

18 the notion that there was such an exception had been accepted by a

19 few lower courts, as well as the Patent and Trademark Office's

20 Trademark Trial and Appeal Board.  <u>Id.</u> at 1094-95.  The basic idea

21 of the exception is that "even those who use marks in other

22 countries can sometimes — when their marks are famous enough — gain

23 exclusive rights to the marks in this country."  <u>Id.</u> at 1095.  The

24 panel justified this conclusion largely on policy grounds: "An

25 absolute territoriality rule without a famous-mark exception would

26 promote consumer confusion and fraud.  Commerce crosses borders.  In

27 this nation of immigrants, so do people.  Trademark is, at its core,

28                              17

about protecting against consumer confusion and 'palming off.'"   Id. at 1094.[3]

Grupo Gigante describes a two-step analytical process to determine whether a mark falls under the famous-mark exception. First, the district court must determine whether the mark has achieved the level of recognition that would be necessary in a domestic trademark infringement case.  Id. at 1098; see also id. at 1106 (Graber, J., concurring).  Second, "where the mark has not before been used in the American market, the court must be satisfied, by a preponderance of the evidence, that a substantial percentage of consumers in the relevant American market is familiar with the foreign mark.  The relevant American market is the geographic area where the defendant uses the alleged infringing mark."  Id. at 1098.  Thus, the standard for famous marks is an intermediate one: "[t]o enjoy extraterritorial trademark protection,

_____

[3] It is worth noting that this justification for the famous marks exception is fundamentally incompatible with the holding of International Bancorp.  If the Ninth Circuit were to adopt International Bancorp, the famous-mark exception would not quite be superfluous: one could imagine a mark that becomes famous through word of mouth, but which is never advertised in the United States and thus does not satisfy the requirements of International Bancorp, but nonetheless qualifies for the famous marks exception.  The Ninth Circuit's reasoning justifying the famous marks exception, however — recognizing an exception to the territoriality principle only in the rare circumstance where not to do so would promote consumer confusion and fraud — would be undermined.  International Bancorp would recognize trademark rights in marks that have not necessarily achieved more than a minimal level of consumer recognition in the United States: so long as the foreign user advertises its services in the United States and manages to attract some American customers to the services provided abroad, the Lanham Act's use in commerce requirement would be deemed satisfied.  As such, we are further confirmed in our prediction that the Ninth Circuit would decline to adopt the holding of International Bancorp, if and when the question is squarely presented to it.

18

the owner of a foreign trademark need not show the level of recognition necessary to receive nation-wide protection against trademark dilution.  On the other hand, the foreign trademark owner who does not use a mark in the United States must show more than the level of recognition that is necessary in a domestic trademark infringement case."  Id. at 1106 (Graber, J., concurring).

Kerzner has argued that under Grupo Gigante, we should examine whether Kerzner's mark had acquired the status of a famous mark at the time the dispute between the parties arose, that is, in 2005 at the earliest.  (Hr'g Tr. at 68-69 (#427).).  Kerzner's interpretation of Grupo Gigante is flawed.  In Grupo Gigante, the Ninth Circuit agreed with the district court that if the mark used abroad by plaintiffs was already a famous mark in the United States "by the time [the defendants] began using it, an exception to the territoriality principle applied."  Id. at 1092; see also Grupo Gigante SA de CV v. Dallo & Co., Inc., 119 F. Supp. 2d 1083, 1091 (C.D. Cal. 2000) (stating that the "relevant inquiry" was whether plaintiff's mark was sufficiently known to United States consumers so as to warrant protection as of the time the defendants first used the mark).  Thus, the relevant date here is April 1996, when Monarch began to use the Atlantis mark in connection with casino services.

That said, evidence developed later may nevertheless be credible evidence of consumer recognition as of the relevant date. In Grupo Gigante, for example, respondents to a survey performed during the course of litigation were asked not just whether they recognized the plaintiffs' mark, but also when they had first heard

of it to the best of their recollection.  See Grupo Gigante, 119 F.
Supp. 2d at 1093.

In short, Monarch is entitled to summary judgment on the
applicability of the Grupo Gigante famous-marks exception to the
territoriality principle if there is no genuine issue of material
fact regarding whether Kerzner's Atlantis mark acquired the status
of a famous mark before Monarch adopted the Atlantis mark in
connection with casino services in April 1996.

### a. Distinctiveness

In order to be protected as a trademark, a mark must be capable
of identifying particular goods and services and distinguishing them
from the goods and services of others.  See, e.g., Two Pesos, Inc.
v. Taco Cabana, Inc., 505 U.S. 763, 768-69 (1992); Lahoti v.
Vericheck, Inc., ---F.3d---, 2009 WL 3807105 (9th Cir. Nov. 16,
2009).  Marks that are fanciful, arbitrary, or suggestive are
regarded as immediately capable of identifying particular goods or
services, and thus are deemed inherently distinctive and entitled to
protection immediately upon adoption and use.  Two Pesos, 505 U.S.
at 768.  Marks that are merely descriptive of a product are not
inherently distinctive, but may acquire distinctiveness; this
acquired distinctiveness is generally called "secondary meaning."
Id. at 769.  Marks that are generic — that is, marks that refer to
"the genus of which the particular product is a species" — are
considered incapable of acquiring distinctiveness, and are never
entitled to trademark protection.  Id. at 768.

The mark at issue in Grupo Gigante was deemed descriptive and
thus was not entitled to trademark protection, even if used

1   domestically, until secondary meaning had been achieved.  <u>See</u> <u>Grupo</u>

2   <u>Gigante</u>, 391 F.3d at 1095.  The Ninth Circuit agreed with the

3   district court's determination that the mark had achieved secondary

4   meaning.  <u>Id.</u> at 1098.

5        The mark at issue in the present case, however, is arbitrary:

6   "Atlantis" does not have any descriptive meaning when applied to

7   casino or lodging services.[4]  Thus, the mark is inherently

8   distinctive, and an inquiry into secondary meaning is not necessary.

9   The factors relevant to the secondary meaning analysis, however,

10  also bear on the second, "substantial percentage of consumers,"

11  analysis: "secondary meaning is, in effect, synonymous with consumer

12  recognition and association."  <u>Grupo Gigante</u>, 119 F. Supp. 2d at

13  1091 (citing <u>Carter-Wallace, inc. v. Procter & Gamble Co.</u>, 434 F.2d

14  794, 802 (9th Cir. 1970)).

15                <u>b. Substantial Percentage of Consumers</u>

16       The majority opinion in <u>Grupo Gigante</u> provides very little

17  guidance as to what, exactly, constitutes a sufficiently

18  "substantial" percentage of consumers who are familiar with a

19  foreign mark for the foreign mark exception to the territoriality

20  principal to apply.  The concurrence suggests 50%, following the

21  analysis of Professor McCarthy.  <u>Grupo Gigante</u>, 391 F.3d at 1108

22  (Graber, J., concurring).  On that basis, the concurrence would have

23  _____

24       [4] If a casino resort where such services were offered were
    located in a town called "Atlantis," say, then the mark would be
25  descriptive.  As applied to a seafood restaurant, the mark would
    probably best be considered suggestive, as evocative of the ocean and
26  thus seafood through the association with the legendary sunken
    continent of that name.  When used in connection with casino resorts
27  located in Reno, The Bahamas, or Las Vegas, however, the Atlantis mark
    is arbitrary.

28                                21

held that the mark at issue did not fall under the famous-mark exception as a matter of law.  Id.  The majority, however, did not adopt the concurrence's suggestion, expressing no opinion on what the result should be on remand.  Id. at 1098-99.  Moreover, it seems likely that if the majority intended the standard to be 50%, they would have phrased the test not as a "substantial percentage of consumers," but as a "majority of consumers."

        The relevant factors in determining whether a substantial percentage of consumers are familiar with a foreign mark, borrowed from the secondary meaning context, include: survey evidence; direct consumer testimony; exclusivity, manner and length of use of the mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant.  See, e.g., Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1151 (9th Cir. 1999).  Survey evidence will often provide the most persuasive evidence of consumer recognition and association, but it is not a requirement.  Comm. for Idaho's High Desert v. Yost, 92 F.3d 814, 822 (9th Cir. 1996); Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985).  Also, the Ninth Circuit emphasized in Grupo Gigante that "such factors as the intentional copying of the mark by the defendant, and whether customers of the American firm are likely to think they are patronizing the same firm that uses the mark in another country" are of particular importance: though "not necessarily determinative, they are particularly relevant because they bear heavily on the risks of consumer confusion and fraud,

22

1  which are the reasons for having a famous-mark exception." Grupo

2  Gigante, 391 F.3d at 1098.[5]

3      Kerzner's evidence of consumer awareness of Kerzner's casino

4  resort operated under the Atlantis mark includes the expert report

5  of Dr. Jacob Jacoby.  (Jacoby Report, PX 55 (#334-58).)  Dr. Jacoby

6  found that 37.6% of those surveyed were aware of Kerzner's Atlantis

7  resort in the Bahamas, with 57.6% of those surveyed in Las Vegas

8  being aware of it.  (Id. at 31.)  The relevant geographic area under

9  Grupo Gigante is "the geographic area where the defendant uses the

10 alleged infringing mark."  Grupo Gigante, 391 F.3d at 1098.

11 Consumer awareness in Las Vegas, therefore, is the more relevant

12 measurement, since it is the potential construction of an Atlantis

13 casino resort in Las Vegas that is at issue in this case.  Under

14 Grupo Gigante, the 57.6% consumer awareness shown by Dr. Jacoby's

15 investigation would be sufficient to justify a finding that the mark

16 is famous or well-known — it is sufficient even under the stricter

17 50% standard suggested by the concurrence.

18     Dr. Jacoby's surveys, however, were performed in 2007.  Unlike

19 the surveys discussed in Grupo Gigante, Dr. Jacoby did not ask

20 respondents when they had first heard of the foreign user's mark,

21 instead measuring only consumer awareness as of the time of the

22 survey.  C.f. Grupo Gigante, 119 F. Supp. 2d at 1093.  Dr. Jacoby's

23 surveys may be probative of whether Kerzner now qualifies for

24 trademark protection now under the famous-mark exception, and thus

25

26     [5] We discuss below only those factors, and the evidence relating
    to them, that are most relevant to our disposition of the present
    motion, though we have considered all the factors and all the evidence
27  in the record.

28                                23

are relevant to Kerzner's claims for injunctive relief going forward.  But Dr. Jacoby's surveys lack any probative value regarding the fame of Kerzner's mark at the time relevant for the present inquiry, which is when Monarch began using the Atlantis mark, in April 1996.

Dr. Jacoby's surveys may be somewhat probative of the issue of whether customers of the American firm are likely to think they are patronizing the same firm that uses the mark in another country. Dr. Jacoby used, among other things, advertisements for a hypothetical Monarch Atlantis casino resort in Las Vegas derived from actual advertisements for Monarch's Reno facility, as well as actual advertisements for Kerzner's casino resort in The Bahamas, to investigate whether survey respondents would be likely to think the two were associated in some way.[6]  (Jacoby Report, PX 55 at 15-23 (#334-58).)  Dr. Jacoby concluded that approximately one in four respondents would think that there was some association between them.[7]  There is no reason to believe that the results of this

---

[6] We do not here attempt a complete description of Dr. Jacoby's methodology, but only a brief summary of its essence, as directly relevant to the issues now before us.

[7] Monarch objects that these results are irrelevant because Dr. Jacoby failed to separate out consumer confusion arising from use of the Atlantis mark in connection with casino services from use in connection with hotel or lodging services.  This argument is without merit: "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001).  Neither Monarch nor Kerzner use the Atlantis mark for casino services in a stand-alone casino, nor does either side allege that the other was seeking to create such an establishment in Las Vegas.  Thus, a survey examining consumer confusion relating to a combined hotel and casino facility was appropriate, because it roughly approximates the marketplace conditions at issue.

inquiry would have been different in April 1996 — the survey's methodology does not depend on consumers previously being aware of either of the parties' actual casino resorts. Again, however, this evidence is not particularly helpful in determining when, precisely, Kerzner's mark may have achieved the status of a famous mark in the Las Vegas market. It only indicates that if a Monarch casino resort were to exist in Las Vegas at some point in the future, there would be a significant likelihood of consumer confusion.

In addition to Dr. Jacoby's surveys, there is substantial evidence in the record relating to the amount and manner of advertising associated with the reopening of Kerzner's casino resort under the Atlantis mark. Kerzner engaged in an extensive promotional campaign to bring its remodeled and renamed casino resort in The Bahamas to the attention of American consumers. There is little in the record to tie this campaign specifically to the Las Vegas market. Nevertheless, the campaign included advertisements and other promotions in national media which, it may reasonably be inferred, penetrated the Las Vegas market. (<u>E.g.</u> PX's 3-5, 8, 11, 12, 23 (#334).)

There is some evidence in the record of Kerzner's amount of sales and number of customers for casino services under the Atlantis mark. The expert report of Stephen Visser includes tables of such information, broken down by the country and state of origin of Kerzner's guests. (PX 54 (#334-57).) This evidence, however, appears to relate to a time period well after that which is relevant to the present inquiry, beginning with data from no earlier than 1999. (<u>Id.</u> at 9-10.) Moreover, with regard to the information

about Nevada, it does not distinguish between the Las Vegas market and the remainder of the state. Id. As such, this evidence is not relevant to the present inquiry.

There is little or no evidence to indicate Monarch was intentionally copying Kerzner's example when it adopted the Atlantis mark in April of 1996. Though Kerzner's casino resort in The Bahamas was already operating under the Atlantis mark when Monarch changed the name of its facility in Reno, there is no specific evidence that Monarch was copying from Kerzner's example. Rather, it appears that Monarch was expanding its prior use of the Atlantis mark in connection with its restaurant to encompass its entire Reno casino resort. As noted above, Monarch's use of the Atlantis mark in connection with its restaurant predates Kerzner's use of the mark. This factor, therefore, has little weight in the circumstances of this case.

Although it is a close question, we conclude that there is a genuine issue of material fact regarding when, if ever, Kerzner's casino resort acquired the status of a famous mark in the meaning of Grupo Gigante. Taking all reasonable inferences in Kerzner's favor, as we must in the present procedural posture, a jury could conclude that by April 1996 a substantial percentage of consumers in the Las Vegas market were familiar with Kerzner's mark. Such a result would be supported, inter alia, by the evidence of Kerzner's substantial national advertising campaign, as well as other media coverage associated with the December 1994 reopening, which constitutes circumstantial evidence of such familiarity. If the jury were to so conclude, Kerzner would have priority of use in the Atlantis mark

for casino services in the United States under the <u>Grupo Gigante</u> famous marks exception.[8]

In short, Kerzner's arguments regarding priority of use based on <u>Penta Hotels</u> and <u>International Bancorp</u> are unpersuasive.  There is some evidence in the record, however, that Kerzner acquired priority of use in the Atlantis mark for casino services under the <u>Grupo Gigante</u> famous marks exception.  As such, Monarch's motion (#277) must be denied.

### IV. Monarch's Motion (#310) Re. Standing

Monarch has filed a motion entitled "Defendants/Counterclaimants' Motion for Summary Judgment on the Issue that Kerzner Does not Use an Atlantis Mark to Provide Casino Services in Commerce, in the United States, and Thus Has No Standing to Bring this Action" (#310).  Kerzner has opposed (#346) the motion (#310), and Monarch has replied (#397).

"To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." <u>Halicki Films, LLC v. Sanderson Sales and Mktg.</u>, 547 F.3d 1213, 1225 (9th Cir. 2008); <u>see</u> 15 U.S.C. §§ 1114(1), 1125(a).

---

[8] There is also substantial evidence in the record in support of the contrary conclusion.  For example, in a January 1995 article in the magazine <u>Travel Agent</u>, the former Kerzner Chief Marketing Officer is quoted as saying "Everyone knows . . . Paradise Island Resort & Casino.  They don't know Atlantis yet." (PX 11 at 5 (#334-11).)  How to weigh such conflicting evidence is for the jury to decide.

As the title of Monarch's motion (#310) suggests, Monarch argues that Kerzner lacks standing because Kerzner has not used the Atlantis mark in connection with casino services in the United States.  This argument fails to account for the holding of <u>Grupo Gigante</u> discussed above, that a foreign user of a mark may obtain trademark rights in the United States without using the mark in the United States under the famous-marks exception to the territoriality principle.[9]  We concluded above that there remains a genuine issue of material fact regarding when, if ever, Kerzner's mark acquired the status of a famous mark.  If it did, then Kerzner has standing to enforce its rights in that famous mark, just like any other party who owns a mark or who has a cognizable interest in a mark.

Monarch's motion (#310), therefore, will be denied.

**V. Monarch's Motion (#299) Re. Damages and Injunctive Relief**

Monarch has filed a motion entitled "Defendants/Counterclaimant's Motion for Summary Judgment on the Issue that Plaintiffs/Counterdefendants' [sic] Cannot Prevail On Their Claims Because They Cannot Prove the Essential Elements of Damages, or Entitlement to Injunctive Relief" (#299).  Kerzner has opposed (#346) the motion (#299), and Monarch has replied (#388).

---

[9] Monarch suggests in passing that the famous-mark exception may only entitle the foreign user to injunctive relief, as opposed to full trademark rights.  (Reply at 18 (#397).)  This suggestion is unsupported by argument, and appears to be without merit in any case. There is nothing in <u>Grupo Gigante</u>, or any other authority that we have discovered, that would so limit the trademark rights of the foreign users whose marks fall within the famous-marks exception.

It is undisputed that Kerzner has suffered no damages as a result of Monarch's conduct, and Kerzner does not continue to press its claims for damages.  (See P.'s Opp. at 66-67 (#346).)  At issue, therefore, is only whether Kerzner could be entitled to injunctive relief if it succeeds in demonstrating that it holds senior rights in the Atlantis mark under the famous-mark exception.

A party seeking a permanent injunction must satisfy a four-factor test, demonstrating: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  eBay Inc. v. MarcExchange, L.L.C., 547 U.S. 388, 391 (2006).  In the trademark context, "once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."  Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n.3 (9th Cir. 1989).

Monarch's argument that Kerzner cannot show an entitlement to injunctive relief is essentially three-fold.  First, Monarch asserts that it has never had any specific plans to develop a casino resort in Las Vegas, let alone one under the Atlantis mark.  Thus, Monarch argues, Kerzner could not demonstrate irreparable injury.  Second, Monarch notes that it is undisputed that no likelihood of confusion would arise from Monarch operating a hotel alone, without a casino, in Nevada.  Monarch has the right to operate such a hotel under its

license agreement with Lodge, and now Kerzner as assignee of Lodge's rights. Monarch argues that, in light of these circumstances, there is no evidence that a Las Vegas Atlantis hotel and casino run by Monarch would create any additional likelihood of confusion. Finally, Monarch argues that in order to be entitled to injunctive relief, under the so-called "Dawn Donut" rule Kerzner would have to have plans of its own to begin offering casino services to consumers in Las Vegas, but Kerzner admits that it does not have any such plans.

### A. Evidence of Monarch's Plans re. Las Vegas

Monarch argues that there is a complete lack of any evidence that it has, or indeed ever had, specific plans to expand its use of the Atlantis mark in connection with casino services to Las Vegas. As such, Monarch argues that an injunction would be inappropriate because of a lack of any showing of likelihood of irreparable harm if the injunction did not issue.

There are several pieces of evidence in the record, however, from which it could reasonably be inferred that Monarch's alleged intention to expand to Las Vegas was not wholly speculation on the part of Kerzner. For example, in interrogatory answers, Monarch stated that it had what it first characterized as a "business plan (intellectual, not a written document)," and then through supplementation recharacterized as a "concept or idea," for operation of a casino using the Atlantis mark in Las Vegas. (PX 51 at 8 (#334-55); PX 52 at 6 (#334-56).) Further, Monarch stated in the same interrogatory answer that it "has contacted individuals expressing its interest in identifying potential business

opportunities in Las Vegas." (PX 51 at 8 (#334-55); PX 52 at 6 (#334-56).) Additionally, Mr. Farahi, the principal owner, co-chairman, and CEO of Monarch testified in his deposition that he had a conversation with a Mr. Carlin, who is Monarch's investment banker, in which he stated that he wanted to use the Atlantis mark for a resort in Las Vegas including, among other things, a casino. (PX 58 at 62 (#334-72).) Mr. Carlin confirmed in his deposition that his instructions were to "go back to Kerzner and explain that a buyer of Monarch could use the Atlantis name on anything in Las Vegas." (Carlin Dep., PX 56 at 105 (#334-69).)

Taking reasonable inferences in Kerzner's favor, this evidence is sufficient to demonstrate that Monarch had relatively immediate intentions either to open a casino resort under the Atlantis mark in Las Vegas or to sell rights in the mark to someone who would, and had taken at least some steps towards implementation of those intentions. Thus, an injunction might well be an appropriate remedy after the conclusion of this lawsuit if Kerzner convinces the jury that it has senior rights in the mark. See 5 McCarthy, supra, § 30:1 (noting that "the common historical practice has been that a prevailing plaintiff in a case of trademark infringement . . . will ordinarily receive injunctive relief of some kind."). That said, however, it is not necessarily the case that the prevailing party in a trademark case is always entitled to injunctive relief. See Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 381 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

31

<u>B. Likelihood of Confusion</u>

Monarch notes that it is undisputed that Monarch has the exclusive right under its license agreement with Lodge, and now Kerzner as Lodge's assignee, to use the Atlantis mark for lodging services in Nevada, including Las Vegas.  Monarch suggests that a Las Vegas resort hotel and casino under the Atlantis mark would create no greater likelihood of confusion than a facility offering only lodging services.  As such, Monarch argues, Kerzner cannot demonstrate any additional likelihood of confusion that Kerzner might be entitled to enjoin.[10]

Monarch's premise that a full casino resort under the Atlantis mark would create no greater likelihood of confusion than a mere hotel is questionable.  A facility that is both a hotel and a casino would more closely resemble Kerzner's casino resort in The Bahamas than a facility that only offers lodging services.  Taking reasonable inferences in Kerzner's favor, a greater likelihood of confusion would be expected where the facilities at issue are more similar.

---

[10] The Ninth Circuit has developed an eight-factor test, the so-called <u>Sleekcraft</u> factors, to guide the determination of the likelihood of consumer confusion.  <u>See</u> <u>GoTo.com, Inc. v. Walt Disney, Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000) (citing <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348 (9th Cir. 1979) and applying the <u>Sleekcraft</u> factors in the service marks context).  Rather than proceeding mechanically through discussion of each of the <u>Sleekcraft</u> factors, we will here address only issues raised by Monarch's motion. <u>See</u> <u>Brookfield</u>, 174 F.3d at 1054 (noting that the relative importance of each individual <u>Sleekcraft</u> factor is "case-specific" and that "non-listed variables may often be quite important").  Monarch's argument in the present motion may implicitly invoke the second of the eight <u>Sleekcraft</u> factors, regarding the relatedness or proximity of the two companies' services, though Monarch does not phrase its argument in those terms.

In any case, however, Monarch's argument fails.  In essence, Monarch imagines that its licensing of the Atlantis mark entitles it to create a certain likelihood of consumer confusion through providing lodging services, and only activities that would create an additional likelihood of consumer confusion could give rise to liability.  We disagree.  Indeed, a consumer who believed such a hotel to be somehow associated with Kerzner's mark would not be confused at all: as a result of the assignment agreement between Lodge and Kerzner, Monarch is now Kerzner's licensee, and to that extent there would be an association of sorts.

Monarch is not contractually entitled, however, to use the Atlantis mark in connection with both casino services and lodging services.  Lodge never operated any casino, and it is undisputed that Monarch acquired no rights in the Atlantis mark with regard to casino services through its license for lodging services.  Thus, a consumer who believed casino services provided at a Monarch Atlantis casino resort in Las Vegas to be associated with Kerzner would be confused in a way that the consumer making the same association with regard to lodging services alone would not be.  If Kerzner prevails at trial, it may be issued an injunction to prevent such consumer confusion.

C. The "Dawn Donut" Rule

One of the seminal cases in trademark law is Dawn Donut Co., Inc. v. Hart's Food Stores, Inc. 267 F.2d 358 (2d Cir. 1959), which spawned the so-called Dawn Donut rule.  Under the Dawn Donut rule, even if a federal registrant has rights in a mark, it is not necessarily entitled to an injunction against an unauthorized user:

1  "if the use of the marks by the registrant and the unauthorized user

2  are confined to two sufficiently distinct and geographically

3  separate markets, with no likelihood that the registrant will expand

4  his use into the defendant's market, so that no public confusion is

5  possible, then the registrant is not entitled to enjoin the junior

6  user's use of the mark." Dawn Donut, 267 F.2d at 364 (footnote

7  omitted); see also Fairway Foods, Inc. v. Fairway Markets, Inc., 227

8  F.2d 193, 198 (9th Cir. 1955) (vacating injunction issued to

9  prevailing plaintiff on essentially the same basis as later became

10  known as the Dawn Donut rule).  Only once the federal registrant has

11  expanded its use of the mark, so that the market areas of the two

12  users are no longer separate and distinct, will the registrant be

13  entitled to an injunction.  Mister Donut of Am., Inc. v. Mr. Donut,

14  Inc., 418 F.2d 838, 844 (9th Cir. 1969) (citing Dawn Donut).

15  Monarch argues that the Dawn Donut rule precludes issuance of an

16  injunction in this case because Kerzner has no immediate plans to

17  enter the Las Vegas market under the Atlantis mark.  We disagree.

18      Even assuming that Kerzner has no intention of ever opening a

19  casino in Las Vegas, it might still receive an injunction against

20  Monarch doing so, the Dawn Donut rule notwithstanding.  The basis

21  for the Dawn Donut rule is the premise that, with regard to users

22  with geographically separate markets, no consumer confusion is

23  possible.  See Dawn Donut, 267 F.2d at 364.  Grupo Gigante

24  recognizes that consumer confusion can occur in relation to a famous

25  mark, even if the user of the mark has no intention of ever using

26  the mark in the United States.  See Grupo Gigante, 391 F.3d at 1094.

27  Thus, although the issue has not yet been addressed by any court,

28

34

1  the Grupo Gigante exception to the territoriality principle
2  necessarily implies an exception to the Dawn Donut rule.   An
3  injunction covering areas of the United States where a mark used
4  exclusively abroad is determined to be famous in the meaning of
5  Grupo Gigante would be appropriate to prevent the consumer confusion
6  and potential for fraud that would otherwise likely result.
7
8          **V.  Monarch's Motion (#279) Re. State Registration**
9       Monarch has filed a motion entitled
10  "Defendant/Counterclaimants' Motion for Summary Judgment on
11  Monarch's Sixth Counterclaim, for a Declaratory Judgment that Under
12  NRS § 600.050 et seq. Monarch's Nevada State Registration for Casino
13  Services is Valid and Enforceable" (#279).   Kerzner has opposed
14  (#346) the motion (#279), and Monarch has replied (#373).
15       Monarch makes two basic arguments in this motion.   First,
16  Monarch asserts that its Nevada State Registration for the mark
17  "Atlantis Casino Resort" for casino services is valid and
18  enforceable as a matter of state law.   This point is undisputed:
19  Kerzner has not challenged the validity of Monarch's state
20  registration as a matter of state law.   Second, Monarch argues that
21  the usual rule — that state trademark law is preempted by the Lanham
22  Act insofar as the former would narrow a federal registrant's rights
23  — does not apply here, and Monarch's rights under Nevada state law
24  instead trump any federal rights Kerzner may enjoy, under the
25  unusual circumstances of this case.   This second argument is without
26  merit, as we will now explain.
27
28                                  35

The Lanham Act does not have broad preclusive effect; rather, it only preempts state laws which would provide less protection than the Lanham Act, and thus would permit federal trademarks to be infringed.  See, e.g., Golden Door, Inc. v. Odisho, 646 F.2d 347, 352 (9th Cir. 1980).  For example, the obtaining of a state registration does not necessarily reserve the whole state for the state registrant as a matter of federal law; rather, the state registrant's rights would yield before those of a federal registrant, except in the exact territory the state registrant had continuously used the mark prior to the federal registrant's constructive use date.  See 15 U.S.C. § 1115(b)(5); 3 McCarthy, supra, § 22:2.

Monarch argues, however, that in this case its Nevada state trademark rights do not yield before Kerzner's rights deriving from the federal '825 Registration because Kerzner could not, as matter of Nevada law, use its Atlantis mark in Las Vegas.  Monarch's idea here is that, under Nevada law, in order to obtain an unrestricted gaming license in a county of more than 100,000 population, the casino must be associated with a hotel with at least 200 rooms.  See Nev. Rev. Stat. §§ 463.1605, 463.01865.  Monarch, however, holds exclusive rights for use of the Atlantis mark for lodging services under its license from Lodge (and now Kerzner, as a result of the Lodge-Kerzner assignment agreement).  Thus, Monarch argues, Kerzner could not build a casino resort including both a casino and a 200-room hotel in Las Vegas under the Atlantis mark, and could not use the Atlantis mark for casino services in Las Vegas or anywhere else in Nevada where the 200-room hotel requirement applies.  Monarch

1 reasons that if Kerzner cannot not use the name in Nevada, Monarch
2 is not blocked from doing so by any federal trademark rights Kerzner
3 may enjoy elsewhere in the United States.

4 　　　Monarch's argument, however, is flawed.  Even if Kerzner is not
5 able to, or even simply does not want to, operate a casino in
6 Nevada, it may still have federal trademark rights enforceable in
7 Nevada under the famous marks exception.  As discussed above, under
8 Grupo Gigante, foreign marks, even if not used within the United
9 States, let alone any particular state, are entitled to trademark
10 protection under federal law if they have achieved the required
11 level of consumer recognition in the relevant geographic area.
12 Thus, if Kerzner's mark falls under the famous mark exception,
13 Kerzner has federal rights that would preempt Monarch's state
14 trademark rights.  To hold otherwise would be contrary to the
15 principle that state law may create greater protection against
16 consumer confusion than federal law, but may not erode those
17 protections provided under the Lanham Act or permit consumer
18 confusion that federal law seeks to prevent.  See, e.g., Golden
19 Door, 646 F.2d at 352.

20 　　　In addition to the two arguments we have already discussed,
21 Monarch raises a third argument in its Reply (#373) related to the
22 "natural zone of expansion" doctrine.  Issues raised for the first
23 time in a reply brief are not ordinarily considered by the Court.
24 United States v. Boyce, 148 F. Supp. 2d 1069, 1085 (S.D. Cal. 2001).
25 Here, however, Monarch's argument raises an issue of law that the
26 Court would inevitably have to address, either prior to or in the
27 course of trial.  We will, therefore, briefly comment on it.

28                                       37

Monarch invokes the "natural zone of expansion" doctrine to argue that Monarch is entitled to statewide rights in the Atlantis mark. (D.'s Reply at (#373).) This would be contrary to the usual rule, discussed above, that the state registrant's rights would yield before those of a federal registrant except in the exact territory the state registrant had continuously used the mark prior to the federal registrant's constructive use date. See 15 U.S.C. § 1115(b)(5); 3 McCarthy, supra, § 22:2. But Monarch asserts that in the circumstances of this case, Las Vegas is within its "natural zone of expansion," and therefore Monarch should be treated as if Las Vegas is within the territory where it has already used the mark in connection with casino services, even though Monarch does not actually operate a casino in Las Vegas.

The natural zone of expansion doctrine derives from dictum in Justice Holmes' concurrence in the famous "Tea Rose" case, suggesting that state political boundaries should define trademark rights. See Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 424-26 (Holmes, J., concurring). The doctrine is normally invoked by senior users seeking to expand their federal statutory trademark rights into areas where a junior user is already using the mark under the protection of the common law. See 5 McCarthy, supra, § 26:20. Here, Monarch turns the doctrine on its head, seeking to leverage its state trademark rights to expand the geographic area in which it is entitled to trademark protections in derogation of Kerzner's federal rights. Monarch has not cited, nor have we discovered, any authority for so applying the natural zone of

expansion doctrine.[11]  Monarch's arguments based on the natural zone of expansion doctrine, therefore, will be rejected.

In short, Monarch's Motion (#279) will be granted in part and denied in part.  Monarch's state registration of the Atlantis mark is valid and enforceable as a matter of Nevada law.  That state registration does not, however, necessarily entitle Monarch to use the Atlantis mark throughout Nevada; Kerzner may have federal rights that would preempt any state rights Monarch enjoys.  Since the extent of Kerzner's federal rights, if any, is dependent on the resolution of genuine issues of material fact — namely, whether Kerzner falls within the Grupo Gigante famous marks exception, and when exactly it acquired that status — it is impossible at this stage to delineate the respective rights of the parties in a precise or final manner.

## VI. Conclusion

Kerzner's arguments based on Penta Hotels and International Bancorp are unpersuasive.  There is, however, a genuine issue of material fact regarding whether Kerzner acquired priority of use in the Atlantis mark under the Grupo Gigante famous marks exception. If it did, Kerzner has standing to enforce its trademark rights in the mark by seeking damages, injunctive relief, or both.  Although Kerzner does not seek damages here, Kerzner may be able to prove that an injunction would be appropriate in the circumstances of this

---

[11] Even in the more usual circumstance, most courts have rejected the senior user's arguments on the facts, narrowly defining the senior user's zone of natural expansion.  See 5 McCarthy, supra, § 26:20.

case.  Finally, Kerzner's claims to such relief are not trumped by Monarch's state registration of the Atlantis mark for casino services.  Even if Kerzner has no intention of operating a casino in Nevada, it may have federal rights in the mark under the famous mark exception that would preempt the state trademark rights Monarch seeks to assert.

**IT IS THEREFORE HEREBY ORDERED** that Monarch's "Motion for Partial Summary Judgment that Monarch has Priority of Use of the 'Atlantis' Mark for Casino Services in the United States" (#277) is **DENIED**.

**IT IS FURTHER ORDERED** that Monarch's "Motion for Summary Judgment on the Issue that Kerzner Does not Use an Atlantis Mark to Provide Casino Services in Commerce, in the United States, and Thus Has No Standing to Bring this Action" (#310) is **DENIED**.

**IT IS FURTHER ORDERED** that Monarch's "Motion for Summary Judgment on the Issue that Plaintiffs/Counterdefendants' [sic] Cannot Prevail On Their Claims Because They Cannot Prove the Essential Elements of Damages, or Entitlement to Injunctive Relief" (#299) is **DENIED**.

**IT IS FURTHER ORDERED** that Monarch's "Motion for Summary Judgment on Monarch's Sixth Counterclaim, for a Declaratory Judgment that Under NRS § 600.050 et seq. Monarch's Nevada State Registration for Casino Services is Valid and Enforceable" (#279) is **GRANTED IN**

**PART and DENIED IN PART** on the following basis: Monarch's state

registration of the Atlantis mark is valid and enforceable as a

matter of Nevada law.  Monarch's state registration does not,

however, necessarily entitle it to use the Atlantis mark throughout

Nevada; Kerzner may have federal rights that would preempt any state

rights Monarch enjoys.

DATED: December 14, 2009.

_____
UNITED STATES DISTRICT JUDGE

41