1

2

3

4                    **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF NEVADA**
5                          **RENO, NEVADA**

6

7

KERZNER INTERNATIONAL LIMITED, and )   3:06-CV-232-ECR-RAM
8 KERZNER INTERNATIONAL RESORTS,      )
INC.,                                 )
9                                     )
        Plaintiffs,                   )   <u>**Order**</u>
10                                    )
vs.                                   )
11                                    )
MONARCH CASINO & RESORT, INC., and    )
12 GOLDEN ROAD MOTOR INN, INC.,        )
                                      )
13      Defendants.                   )
                                   ___)
14 MONARCH CASINO & RESORT, INC., and )
GOLDEN ROAD MOTOR INN, INC.,          )
15                                    )
        Counterclaimants,             )
16                                    )
vs.                                   )
17                                    )
KERZNER INTERNATIONAL LIMITED, and    )
18 KERZNER INTERNATIONAL RESORTS,      )
INC.,                                 )
19                                    )
        Counterdefendants.            )
20                                    )
                                   ___)
21

22      This case is a trademark infringement action relating to the

23 "Atlantis" mark used by Plaintiffs/Counterdefendants Kerzner

24 International Limited and Kerzner International Resorts, Inc.

25 ("Kerzner") at a casino resort located on Paradise Island in The

26 Bahamas, and by Defendants/Counterclaimants Monarch Casino & Resort,

27 Inc. and Golden Road Motor Inn, Inc. ("Monarch") at a casino resort

28 in Reno, Nevada.  On November 12, 2009, we held a hearing regarding

1  the many motions that are pending in this case.  In a separate
2  order, we ruled on several of those motions.  We now rule on the
3  remaining motions, which include four motions for partial summary
4  judgment filed by Monarch (## 278, 280, 316, 322) and a motion for
5  partial summary judgment filed by Kerzner (#325), as well as five
6  evidentiary motions (## 340, 345, 364, 376, 395).

7

8                          **I. Background**

9       The Atlantis mark was first registered for lodging services by
10  Atlantis Lodge, Inc. ("Lodge") on October 11, 1994 (U.S.
11  Registration No. 1,857,994).  Lodge has used the Atlantis mark for
12  lodging services in North Carolina since June 6, 1963.  The present
13  case has its roots in the circumstance that Lodge separately
14  licensed the Atlantis mark to both Kerzner and Monarch.[1]

15       Monarch has been offering lodging services in Reno, Nevada
16  since 1972 and casino services since 1986.  Monarch began using the
17  Atlantis mark in connection with restaurant, bar, lounge, and
18  nightclub services — but not lodging or casino services — in 1992.
19  On February 3, 1996, Monarch entered into a license agreement with
20  Lodge for use of the Atlantis mark.  The agreement entitled Monarch
21  to use the Atlantis mark in connection with lodging services
22  provided at Monarch's Reno casino resort, which had previously
23  operated under the "Clarion" mark, and granted Monarch exclusive use
24  of the Atlantis mark for lodging services in all of Nevada, as well

25  ────────────────
26       [1] In this order, we will generally use the terms "Kerzner" and
    "Monarch" to refer interchangeably to the parties collectively, as
    well as their respective predecessors-in-interest or subsidiaries,
27  except where the distinctions are specifically relevant.

28                                  2

as the right to advertise those services.  In April 1996, Monarch's entire Reno facility began operating under the Atlantis mark, adopting the name "Atlantis Casino Resort."  In July 1997, Monarch obtained a Nevada state trademark registration for the mark "Atlantis Casino Resort" for casino services, which it has since renewed several times.  Monarch did not at any time, however, seek federal registration of the Atlantis mark for casino services.

On October 13, 1994, Kerzner entered into a license agreement with Lodge for use of the Atlantis mark at its casino resort in The Bahamas and in advertising in the United States.  The facility had previously operated as the "Paradise Island Resort and Casino." Kerzner adopted the Atlantis mark in 1994: the advertising campaign for the grand reopening of Kerzner's casino resort under its new name, "Atlantis, Paradise Island," began in October 1994, and the reopening actually occurred in December 1994.

On July 29, 1996, Kerzner entered into an assignment and license agreement with Lodge.  Under this agreement, Kerzner acquired the registered Atlantis mark for lodging services from Lodge and licensed the mark back to Lodge for use in North Carolina. The license agreement between Monarch and Lodge was attached as an exhibit to the Lodge/Kerzner assignment agreement, and Lodge's representations of its right to assign an interest in the Atlantis mark were made subject to Monarch's exclusive license to use the mark for lodging services in Nevada.

In February 1997, Kerzner applied for federal registration of the Atlantis mark for, among other things, casino services by filing an "intent to use" application with the United States Patent and

Trademark Office ("USPTO").  Registration No. 2,810,825 ("'825 Registration") was issued to Kerzner on February 3, 2004, after Kerzner filed a Statement of Use in September 2003, claiming a first use date of October 1994.

While the parties were simply operating their respective businesses in The Bahamas and in Reno, their uses of the Atlantis mark did not lead to dispute.  Indeed, Kerzner has no quarrel with Monarch's continued use of the Atlantis mark at its Reno casino resort.  The parties' respective plans for expansion, however, have collided in Las Vegas.  Each alleges that the other has taken at least some steps towards creation of a casino resort in Las Vegas under the Atlantis mark — either by the party itself or by licensing the mark to a third party — in violation of their respective trademark rights.

Kerzner initiated the present lawsuit by filing its Complaint (#1) on January 27, 2006.  Kerzner filed an Amended Complaint (#5) on February 14, 2006.  Kerzner's Amended Complaint asserts six claims for relief: (1) Declaratory Judgment Pursuant to Section 32(1) of the Lanham Act (trademark infringement); (2) Declaratory Judgment Pursuant to Section 43(A) of the Lanham Act (likelihood of confusion, mistake, or deception); (Declaratory Judgment Pursuant to Section 43(C) of the Lanham Act (dilution of a famous mark); (4) Declaratory Judgment Pursuant to Common Law Trademark Infringement and Unfair Competition; (5) Dilution Pursuant to Nevada Law (Nev. Rev. Stat. § 600.435); and (6) Deceptive Trade Practices Pursuant to Nevada Law (Nev. Rev. Stat. §§ 41.600 and 598.0915).  Kerzner no longer presses its third, fifth, and sixth claims, however, and our

4

1 Minute Order (#425) granted Monarch summary judgment on those
2 claims.

3    Monarch's Amended Answer and Counterclaims (#56) was filed on
4 December 28, 2006.  Monarch denied each of Kerzner's claims for
5 relief, asserted various defenses, and also asserted eight
6 counterclaims for relief[2]: (1) Cancellation of the Fraudulently
7 Obtained '825 Registration; (2) Breach of License Agreement; (3)
8 Indemnification Under the License Agreement; (4) Declaratory Relief
9 Pursuant to Claim for Trademark Infringement; (5) Declaratory Relief
10 that Counterclaimants Have Developed Valid Common Law Rights in an
11 ATLANTIS Mark for Casino Services; (6) Declaratory Relief that
12 Counterclaimants Own A Valid Nevada State Trademark for Casino
13 Services under N.R.S. § 600.050 et seq.; (7) Declaratory Relief
14 Pursuant to Claim for Trademark Infringement Under N.R.S. § 600.050
15 et seq.; and (8) Declaratory Relief Pursuant to Claim for Deceptive
16 Trade Practices.  Six of the eight counterclaims remain in the case;
17 Kerzner's motion (#69) to dismiss Monarch's second and third
18 counterclaims was granted by the Court.  (See Mins. of June 29,
19 2007, Hr'g (#121).)

20

21                    **II. Evidentiary Motions**

22    Now pending are five evidentiary motions, seeking to have
23 certain evidence stricken from the record.  We will address each of
24 the motions separately.

25

26    [2] Monarch sought leave to file a second amended answer and
27 counterclaims to add ninth and tenth counterclaims, but we denied
Monarch leave to do so.  (See Mins. of June 29, 2007, Hr'g (#121).)

28                                5

1     A. Kerzner's Motion Re. Jeffrey M. Samuels (#340)

2     Kerzner has filed a motion entitled "Plaintiffs' Motion in
3 Limine to Exclude the Opinions and Testimony of Defendants'
4 Purported Expert Jeffrey M. Samuels" (#340).  Monarch opposed (#354)
5 the motion; no reply was filed.  See Local Rule 16-3(b) (replies to
6 motions in limine permitted only with leave of the court).

7     Mr. Samuels is currently a professor of law at University of
8 Akron School of Law and is a former head of trademark operations at
9 the United States Patent and Trademark Office.  Monarch proffers his
10 expert testimony to "inform the jury on the intricacies of PTO
11 procedures as they relate to the issuance and validity" of Kerzner's
12 federal registration of the Atlantis mark.  (D.'s Opp. at 2 (#354).)
13 These issues, Monarch argues, would be relevant if the Court does
14 not grant Monarch's motions for summary judgment seeking
15 cancellation of Kerzner's '825 Registration of the Atlantis mark:
16 "Such testimony will help the jury understand potential reasons why
17 the normal presumptive validity of a federally registered trademark
18 might not apply in this case."  (Id. at 9.)

19     For reasons that will be explained below, we will not only
20 deny Monarch's motions for summary judgment regarding cancellation
21 of Kerzner's mark, but will grant summary judgment in Kerzner's
22 favor on that issue.  Thus, at trial Monarch likely will want to
23 explain to the jury why the existence of a valid federal
24 registration does not necessarily mean that Kerzner wins this case,
25 and perhaps it would be helpful to the jury to have an expert
26 familiar with USPTO procedures as a witness to do so.

27

28                                6

Nevertheless, most of the opinions that Monarch suggests Dr. Samuels could offer to the jury relate to matters that will be resolved on summary judgment, and will not be at issue in the trial. (See D.'s Opp. at 5-6 (#354) (arguing that Dr. Samuel's testimony would "help the trier of fact determine if the KIRI Registration is valid and whether KIRI engaged in any improper conduct before the PTO.")  Moreover, as Kerzner notes, much of Dr. Samuel's expert report reads like a legal brief, rather than an expert opinion.  The legal effect — or lack thereof, on some issues — of a federal trademark registration can and should be explained to the jury.  But this can be accomplished by means of appropriate jury instructions. It is the role of the Court, not an expert witness, to inform the jury of the law applicable to the case.  At best, Dr. Samuel's testimony would be repetitious of those jury instructions, and at worst would confusingly conflict with them.  See United States v. Hicks, 103 F.3d 837, 847 (9th Cir. 1996) (upholding exclusion of expert on eyewitness identifications because its substance was covered in cross-examination and jury instructions).

In short, Dr. Samuels' opinions are largely irrelevant to matters that will be at issue at trial.  FED. R. EVID. 401.  To the extent his opinions may have some probative value, it appears that his testimony would be repetitive of matters the Court will be explaining in the jury instructions or likely would be more confusing than helpful to the jury.  FED. R. EVID. 403.  Kerzner's motion (#340) will therefore be granted, and Dr. Samuel's expert report and testimony will be excluded from evidence at trial.

B. Monarch's Motion Re. Jacob Jacoby (#345)

Monarch has filed a motion entitled "Defendants' Motion to Exclude Expert Report and Testimony of Jacob Jacoby" (#345). Kerzner has opposed (#360) the motion, and Monarch has replied (#387).

Jacoby is the expert proffered by Kerzner regarding whether use of the Atlantis mark by Monarch in Las Vegas in connection with casino services would likely lead to consumer confusion with Kerzner's casino resort in The Bahamas. (See P.'s Opp. at 3 (#360); see also Jacoby Report, D.'s Motion (#345) Ex. 7.)  This issue is relevant to whether use of the Atlantis mark by Monarch in Las Vegas would be actionable under the Lanham Act as "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or to the origin, sponsorship or approval of his or her goods or services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)A).

Monarch does not challenge Dr. Jacoby's qualifications to serve as an expert, except by noting that his opinions have been excluded on occasion in other courts, which is irrelevant.  Nor is there any basis to challenge his qualifications — as Kerzner correctly states in its opposition, Dr. Jacoby is a "highly qualified and well-recognized expert in consumer confusion and survey evidence."  (P.'s Opp. at 2 (#360); see also D.'s Motion (#345) Ex. 7, parts 3-4 (Dr. Jacoby's CV).)

Instead of attacking Dr. Jacoby's qualifications generally, Monarch argues that the specific survey that Dr. Jacoby conducted in

8

this case used methodology that was fatally flawed.  Monarch argues that the Jacoby survey blurs the distinction between hotel and casino services, and fails to take into account the circumstance that Monarch is licensed to use the Atlantis mark anywhere in Nevada, including Las Vegas, in connection with lodging services. As such, Monarch argues, Jacoby's survey is irrelevant to the narrow question before the Court, namely, whether Monarch or Kerzner has trademark rights in the Atlantis mark for casino services rendered in Las Vegas.  Only a survey narrowly addressing the question of whether consumers would be confused by a casino using the Atlantis mark, Monarch argues, would be relevant to the present case.

     Monarch's arguments relating to the separation of consumer confusion regarding hotel services from confusion regarding casino services are without merit.  As Monarch notes elsewhere, a casino in Las Vegas would have to be part of a facility offering at least 200 hotel rooms, in addition to a gaming area.  See NEV. REV. STAT. §§ 463.1605, 463.01865.  Thus, a survey that analyzes consumer confusion in the context of such a facility, rather than a stand-alone casino, would on its face provide information more representative of real-world circumstances.  See Trouble v. Wet Seal, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (cited in D.'s Motion at 11 (#345) for the proposition that "[a] survey must duplicate to the extent possible the actual conditions in which a consumer will encounter the two marks that are allegedly confusing.").  Thus, this particular objection to Dr. Jacoby's methodology is without merit.

     Monarch's also contends that Dr. Jacoby's methodology in conducting his surveys is suspect in various other respects.  We

9

need not elaborate these objections in detail, but will simply note
that they do not provide an appropriate basis for excluding Dr.
Jacoby's testimony.  The Ninth Circuit has held that, in the context
of consumer confusion surveys, "as long as they are conducted
according to accepted principles, survey evidence should ordinarily
be found sufficiently reliable under Daubert."  Southland Sod Farms
v. Stover Seed Co., 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (quoting
E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th
Cir. 1992).  There is no indication that Dr. Jacoby's methodology is
so suspect as to warrant exclusion under that standard.  Moreover,
"[t]echnical unreliability goes to the weight accorded a survey, not
it's admissibility."  Id. at 1143 (quoting E. & J. Gallo Winery, 967
F.2d at 1292).

Monarch also objects that Dr. Jacoby's surveys are irrelevant
because they measure consumer confusion only as of 2007.  This point
is well taken: as we have explained elsewhere, Dr. Jacoby's surveys
are not probative of whether Kerzner's mark qualified for the famous
mark exception as of April 1996, when Atlantis adopted the mark in
Reno.  Dr. Jacoby's analysis is relevant, however, to the question
of whether injunctive relief may be appropriate going forward,
should Kerzner prevail at trial.  As such, Dr. Jacoby's survey
evidence should not be excluded from evidence on the basis of
relevance.

Thus, Monarch's Motion (#345) to exclude Dr. Jacoby's report
and testimony will be denied.

10

C. Monarch's Motion Re. Hall & Partners Report (#364)

Monarch has filed a motion entitled "Defendants' Motion in Limine to Exclude Report of Purported and Undisclosed Expert Hall & Partners" (#364). Kerzner has opposed (#391) the motion (#364), and Monarch has replied (#414).

As an initial matter, we note that replies are allowed on motions in limine only with leave of the court. Local Rule 16-3(b). Monarch did not seek leave of the Court to file its Reply (#414); that document, therefore, would normally not be considered. Monarch's motion, however, though styled as a motion in limine, is more properly a motion to strike, in that it primarily aims to strike a particular piece of evidence submitted in support of Kerzner's motion for summary judgment, though it also ranges into broader ground in the course of argument. As such, it may be that Local Rule 16-3 does not apply here. In any case, enforcement of Local Rule 16-3(b) in this instance would not make a difference in our disposition of the motion.

The report at issue is a consumer survey report prepared for Kerzner in 2003 by Hall & Partners as a part of the normal course of business, measuring the market penetration of the Atlantis brand in the United States. Hall & Partners apparently performed many such surveys for Kerzner over the years, but only this one is in our record. It is also mentioned briefly in Kerzner's motion for partial summary judgment (#325) and noted by Dr. Jacoby in his expert report as corroboration of his own survey results.

We need not decide whether the Hall & Partners report is an expert report, as Monarch contends or, as Kerzner argues, simply

11

factual evidence, admissible under an exception to the hearsay rule
or on some other basis.  We have not found it necessary to rely on
the Hall & Partners report in the record with regard to the various
motions for partial summary judgment now pending.  As such,
Monarch's motion (#364) is moot.  The admissibility of any Hall &
Partners reports proffered for admission into evidence at trial will
be considered at a later date, along with any other evidence.

### D. Monarch's Motion to Strike Certain Exhibits (#376)

Monarch has filed a motion entitled "Defendants' Motion to
Strike a Number of Plaintiffs [sic] Exhibits to Plaintiffs' Motion
for Partial Summary Judgment (Document No. 325) as Unauthenticated
or Otherwise Inadmissible" (#376).  More precisely, Monarch objects
to twenty eight of Kerzner's exhibits — seventeen other objections
asserted in the motion (#376) are withdrawn in the reply (#413).
Kerzner has opposed (#407) the motion (#376).

The Ninth Circuit has "repeatedly held that 'documents which
have not had a proper foundation laid to authenticate them cannot
support a motion for summary judgment.'"  Beyene v. Coleman Sec.
Servs. Inc., 854 F.2d 1179, 1182 (9th Cir. 1988) (quoting Canada v.
Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987).
"Whether the authentication requirement should be applied to bar
evidence when its authenticity is not actually disputed is, however,
questionable."  Burch v. Regents of the Univ. of Cal., 433 F. Supp.
2d 1110, 1120 (E.D. Cal. 2006); see also Fenje v. Feld, 301 F. Supp.
2d 781, 789 (N.D. Ill. 2003) ("Even if a party fails to authenticate
a document properly or to lay a proper foundation, the opposing
party is not acting in good faith in raising such an objection if

1  the party nevertheless knows that the document is authentic.")
2  (quoted in Burch).

3       In any case, however, the Court's ruling on Kerzner's motion
4  for partial summary judgment (#325) does not turn on any of the
5  pieces of evidence to which Monarch here objects.  We will not,
6  therefore, address Monarch's objections in detail, because for the
7  moment they are moot.  Monarch may raise its objections again, if
8  appropriate, if and when the evidence is proffered for admission
9  into evidence at trial.

10      E. Kerzner's Motion Re. Affidavit of Laraine Burrell (#395)

11      Kerzner has filed a motion entitled "Motion to Strike Affidavit
12 of Laraine M. I. Burrell (#395).  Monarch opposed (#416) the motion
13 (#395), and Kerzner replied (#417).

14      Kerzner argues that the affidavit of Laraine M. I. Burrell
15 (#369), submitted by Monarch in support of its opposition (#365) to
16 Kerzner's motion for partial summary judgment (#325), should be
17 stricken.  Ms. Burrell is one of the attorneys representing Monarch
18 in the present case.  Her affidavit (#369) purports to establish
19 that the business activities at Kerzner's Florida offices do not
20 include casino services.  Her knowledge comes from a visit she and a
21 paralegal, Sara Whitehead, made to those offices during discovery in
22 this case in March 2007.  Monarch has proposed to substitute the
23 affidavit of Ms. Whitehead in place of Ms. Burrell's, if necessary.

24      We need not address all the issues raised in Kerzner's motion.
25 The Burrell affidavit, as well as the substantively identical
26 Whitehead affidavit are simply irrelevant to any disputed issue now
27 before the Court.  Ms. Burrell avers that during her visit to

28                              13

1 Kerzner's Florida offices she "did not see any evidence of what

2 would ordinarily be considered casino services such as slot

3 machines, or gaming tables."  But no party has claimed that Kerzner

4 is running slot machines or gaming tables in Florida, or anywhere

5 else in the United States.  Rather, the "casino services" that

6 Kerzner claims to offer in the United States under the Atlantis mark

7 are activities it claims are "integral" to the operation of

8 Kerzner's brick and mortar casino in The Bahamas.  (See, e.g.,

9 Kerzner's MPSJ at 19-21 (#325).)  We have addressed the merits of

10 Kerzner's arguments in this regard elsewhere.  With respect to

11 Kerzner's motion to strike (#395), it is here sufficient to note

12 that Ms. Burrell's affidavit has no relevance to any of the various

13 motions for partial summary judgment filed in this case, including

14 Kerzner's (#325).  Because striking the affidavit would make no

15 difference to the disposition of any matter now before the Court,

16 Kerzner's motion (#395) is moot.

17

18 ### III. Motions for Partial Summary Judgment

19      Now pending are several motions for partial summary judgment,

20 including four filed by Monarch (## 278, 280, 316, 322) and one

21 filed by Kerzner (#325)  We will address each of the motions

22 separately.

23      A.  Summary Judgment Standard

24      Summary judgment allows courts to avoid unnecessary trials

25 where no material factual dispute exists.  N.W. Motorcycle Ass'n v.

26 U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  The court

27 must view the evidence and the inferences arising therefrom in the

28                                    14

light most favorable to the nonmoving party, <u>Bagdadi v. Nazar</u>, 84
F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment
where no genuine issues of material fact remain in dispute and the
moving party is entitled to judgment as a matter of law. FED. R.
CIV. P. 56(c). Judgment as a matter of law is appropriate where
there is no legally sufficient evidentiary basis for a reasonable
jury to find for the nonmoving party. FED. R. CIV. P. 50(a). Where
reasonable minds could differ on the material facts at issue,
however, summary judgment should not be granted. <u>Warren v. City of
Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995), <u>cert. denied</u>, 116 S.Ct.
1261 (1996).

The moving party bears the burden of informing the court of the
basis for its motion, together with evidence demonstrating the
absence of any genuine issue of material fact. <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met
its burden, the party opposing the motion may not rest upon mere
allegations or denials in the pleadings, but must set forth specific
facts showing that there exists a genuine issue for trial. <u>Anderson
v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Although the
parties may submit evidence in an inadmissible form — namely,
depositions, admissions, interrogatory answers, and affidavits —
only evidence which might be admissible at trial may be considered
by a trial court in ruling on a motion for summary judgment. FED.
R. CIV. P. 56(c); <u>Beyene v. Coleman Sec. Servs., Inc.</u>, 854 F.2d
1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must
take three necessary steps: (1) it must determine whether a fact is

15

1  material; (2) it must determine whether there exists a genuine issue
2  for the trier of fact, as determined by the documents submitted to
3  the court; and (3) it must consider that evidence in light of the
4  appropriate standard of proof.  <u>Anderson</u>, 477 U.S. at 248.  Summary
5  judgment is not proper if material factual issues exist for trial.
6  <u>B.C. v. Plumas Unified Sch. Dist.</u>, 192 F.3d 1260, 1264 (9th Cir.
7  1999).  "As to materiality, only disputes over facts that might
8  affect the outcome of the suit under the governing law will properly
9  preclude the entry of summary judgment."  <u>Anderson</u>, 477 U.S. at 248.
10  Disputes over irrelevant or unnecessary facts should not be
11  considered.  <u>Id.</u>  Where there is a complete failure of proof on an
12  essential element of the nonmoving party's case, all other facts
13  become immaterial, and the moving party is entitled to judgment as a
14  matter of law.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is not a
15  disfavored procedural shortcut, but rather an integral part of the
16  federal rules as a whole.  <u>Id.</u>

17       <u>B. Monarch's Motion Re. '825 Registration and Injunction (#278)</u>

18       Monarch has filed a motion entitled
19  "Defendant/Counterclaimants' Motion for Partial Summary Judgment
20  that Plaintiffs Cannot Assert their Federal Trademark Registration
21  No. 2,810,825 for Atlantis to Enjoin Defendant/Counterclaimant's use
22  of the Atlantis Mark for Casino Services" (#278).  Kerzner opposed
23  (#346) the motion (#278), and Monarch replied (#372).

24       Monarch's motion (#278) seeks partial summary judgment on three
25  issues: (1) that "Monarch commenced use [of] the ATLANTIS mark in
26  U.S. commerce for casino services prior to Kerzner's filing of its
27  federal application for Registration Number 2,810,825"; (2) that

28                                    16

1  "Monarch's use of the ATLANTIS mark in commerce for casino services
2  has been continuing and uninterrupted from April [1996] to the
3  present"; and (3) that "Registration Number 2,810,825 cannot be used
4  to enjoin Monarch from continuing to use and exploit its common law
5  rights in and to the Atlantis mark."  (D.'s Motion at 10-11 (#278).)

6      The first two issues are undisputed.  Kerzner does not question
7  that Monarch commenced use of the Atlantis mark in 1996, prior to
8  Kerzner's 1997 intent to use application.  Kerzner also does not
9  challenge Monarch's assertion that its use of the Atlantis mark at
10 its Reno facility has been "continuing and uninterrupted."  Kerzner
11 does dispute the third issue, regarding whether the '825
12 Registration can "be used to enjoin Monarch."  But this is, it
13 seems, primarily an example of heated agreement rather than a
14 genuine dispute, as will be explained below.

15     When a party has federally registered a trademark, the party is
16 entitled to a presumptive first use date equivalent to the filing
17 date of its registration application.  See, e.g., Brookfield
18 Commc'ns v. W. Coast Entm't Corp., 174 F.3d 1036, 1051 n.13 (9th
19 Cir. 1999).  The constructive date of first use is the date that the
20 registration application was filed, even if the application was made
21 on an intent to use basis:

22         Under 15 U.S.C. §§ 1051(b), 1051(d), and 1057(c), as long as
           an applicant's mark is eventually granted registration on
23         the principal register, and as long as the applicant does,
           in fact, use the mark in commerce within a set period of
24         time thereafter, the filing of an intent to use application
           constitutes constructive use of the mark, conferring a right
25         of priority, nationwide in effect.

26 CreAgri, Inc. v. USANA Health Scis., Inc., 474 F.3d 626, 629 (9th
27 Cir. 2008) (internal quotation marks omitted)

28                                    17

1    The facts of this case are somewhat unusual, in that Kerzner
2   first applied for federal trademark registration on an intent to use
3   basis, but then later received the '825 Registration based on
4   claimed actual use as of a date well before the filing of its
5   initial intent to use application.  Kerzner's intent to use
6   application was filed in February 1997, but its 2003 Statement of
7   Use, resulting in the 2004 issuance of the '825 Registration,
8   claimed actual use as of October 1994.  Thus, Kerzner has two
9   potential sources of trademark rights.  First, Kerzner may have
10  common law trademark rights dating from the date of first actual use
11  — allegedly, October 1994, though that is a disputed issue of
12  material fact to be resolved at trial.  Second, Kerzner may claim
13  federal statutory trademark rights under 15 U.S.C. § 1057(c) —
14  constructive use, conferring a right of priority, nationwide in
15  effect — as of the date of its application for federal registration
16  in February 1997.

17   Monarch's motion (#278) asks the Court to grant summary
18  judgment on the issue of whether the '825 Registration could
19  "justify enjoining Monarch from continuing to use and exploit its
20  common law, and state registration rights in the ATLANTIS mark for
21  casino services in Nevada."  (D.'s Mot. at 10 (#278).)  In other
22  words, Monarch is asking the Court to rule that Kerzner's federal
23  statutory rights under 15 U.S.C. 1057 could not give Kerzner
24  priority of use over Monarch.  Because Monarch began to use the
25  Atlantis mark for casino services in April 1996[3], and Kerzner did

---

27   [3] We have elsewhere rejected Monarch's arguments that its
    priority of use date is any earlier than April 1996.

18

1  not apply for federal registration until February 1997, Monarch's

2  position is correct.  Kerzner does not, apparently, disagree —

3  Kerzner does, however, insist that it still has priority of use

4  based on actual use, giving rise to common law rights.  (See P.'s

5  Opp. at 58-59 (#346) (describing Monarch's rights as "at best, those

6  of an intermediate junior user . . . whose first use is

7  chronologically intermediate between the senior user's first use and

8  the senior user's federal registration").)  The issue of when, if

9  ever, Kerzner established use in the United States under the <u>Grupo</u>

10  <u>Gigante</u> famous marks exception is a matter we have discussed

11  elsewhere, and which will be resolved at trial.

12      Thus, Monarch is entitled to partial summary judgment on the

13  following basis: (1) Monarch commenced use of the Atlantis mark for

14  casino services prior to Kerzner's application for federal trademark

15  registration that eventually resulted in the issuance of the '825

16  Registration; (2) Monarch's use of the Atlantis mark in commerce for

17  casino services has been continuing and uninterrupted from April

18  1996 to the present; and (3) Kerzner's constructive use of the

19  Atlantis mark under 15 U.S.C. § 1057(c), conferring a right of

20  priority, nationwide in effect, dates to the filing of its intent to

21  use application in February 1997.  The third of these issues,

22  however, has no bearing on what rights in the Atlantis mark, if any,

23  Kerzner may have acquired through actual use of the mark prior to

24  February 1997.

25      <u>C. Monarch's Motion Re. Laches (#280)</u>

26      Monarch has filed a motion entitled

27  "Defendant/Counterclaimants' Motion for Summary Judgment on the

28

1  Defense of Laches" (#280).   Kerzner has opposed (#346) the motion

2  (#280), and Monarch has replied (#374).

3      It is well established that laches is a valid defense to Lanham

4  Act claims for both monetary damages and injunctive relief.   Miller

5  v. Glenn Miller Prods, Inc., 454 F.3d 975, 997 (9th Cir. 2006).

6  This defense "embodies the principle that a plaintiff cannot sit on

7  the knowledge that another company is using its trademark, and then

8  later come forward and seek to enforce its rights."   Internet

9  Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985,

10 989-90 (9th Cir. 2009).   To prevail, a defendant must prove both (1)

11 an unreasonable delay by plaintiff in bringing suit, and (2)

12 prejudice to the defendant.   Id. at 990 (citing Jarrow Formulas,

13 Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002);

14 Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,

15 465 F.3d 1102, 1108 (9th Cir. 2006)).

16     A laches determination is made "with reference to the

17 limitations period for the analogous action at law."   Jarrow, 304

18 F.3d at 835.   If the action was brought within the applicable

19 statute of limitations period, there is a presumption against

20 laches.   See Internet Specialties, 559 F.3d at 990.   If, however,

21 the suit is filed outside of the analogous limitations period, there

22 is a presumption that laches bars the plaintiff's claim.   Id.   The

23 Lanham Act contains no explicit statute of limitation, so courts

24 "borrow" the analogous state time period.   Here, the appropriate

25 limit is the four-year statute of limitations in Nev. Rev. Stat. §

26 11.190(2) for actions involving deceptive trade practices in

27 violation of Nev. Rev. Stat. §§ 598.0903-598.0999.   Both the Lanham

28                                    20

Act and Nevada's deceptive trade practices statute are designed to prevent consumer confusion and deception in the marketplace through false or deceptive use of another's mark or product.  <u>See</u> Nᴇᴠ. Rᴇᴠ. Sᴛᴀᴛ. § 598.0915 (defining "deceptive trade practice"); <u>but see</u> <u>Reno Air Racing Ass'n, Inc. v. McCord</u>, 452 F.3d 1126, 1139 (9th Cir. 2006) (applying three-year statute of limitations from Nev. Rev. Stat. § 11.190(3) for fraud or mistake because the parties had agreed that was the relevant limitations period).

The limitations period for laches starts when the plaintiff knew or should have known about its potential cause of action. <u>Internet Specialties</u>, 559 F.3d at 990 (citing <u>Tillamook</u>, 465 F.3d at 1108, and <u>Jarrow</u>, 304 F.3d at 838); <u>see also</u> <u>Nat. Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.</u>, 937 F.2d 1572, 1581 (Fed. Cir. 1991) ("Logically, laches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made.").  Thus, in a trademark infringement case, the question is when the plaintiff knew or should have known about the likelihood of confusion between its mark and the defendant's mark.  <u>See</u> <u>Internet Specialties</u>, 559 F.3d at 990.

The parties here agree that Monarch's use of the Atlantis mark in Reno has caused no likelihood of confusion with Kerzner's use of the mark in The Bahamas.  Rather, a likelihood of confusion only potentially arises with use of the mark in Las Vegas — the idea is that Las Vegas is part of a more international casino resort market than Reno is, and thus use of the Atlantis mark at a casino resort in Las Vegas would be likely to cause confusion in a way that the simultaneous existence of a Reno Atlantis and a Bahamas Atlantis

21

does not.  The question here, then, is when Kerzner knew or should
have known of Monarch's use or intent to use the Atlantis mark in
connection with casino services in Las Vegas.  This issue is hotly
contested by the parties.

Kerzner argues that it first learned that there was an imminent
possibility that Monarch would begin using the Atlantis mark in
connection with casino services in Las Vegas (or would sell its own
alleged rights to do so to a third party) in Fall 2005, when a
representative of Monarch contacted Kerzner about that possibility
in an attempt to avert a dispute such as the present case.  (See
P.'s Opp. at 61 (#346).)  The present lawsuit was filed on January
27, 2006, after no settlement was reached — a short time, well
within the applicable four-year limit.

Monarch, however, argues that Kerzner knew or should have known
about a likelihood of confusion much sooner.  Kerzner was aware of
Monarch's use of the Atlantis mark no later than July 1996, when
Lodge assigned the Atlantis mark for lodging services to Kerzner,
subject to the license agreement with Monarch.  Monarch was
identified as "Casino" throughout that agreement, so there should
have been no confusion that the Atlantis mark would be used in
connection with casino services, in addition to lodging services.
Further, there are telephone logs that may indicate Kerzner already
knew of Monarch's intent to use of the mark in February 1996.  (See
D.'s Mot. at 6-7 (#280).)  Kerzner also was aware of Monarch's
Nevada state registration of the Atlantis mark for casino services;
Kerzner was informed of it by means of a letter from its outside
counsel to its general counsel.  (See id. at 8-9.)  There were

22

1  apparently some conversations between the parties over the years
2  regarding Monarch's expansion of its Reno facilities, which Monarch
3  argues should have tipped off Kerzner that Monarch intended to grow
4  its operations around the Atlantis mark to the extent permitted
5  under its license agreement with Lodge and its Nevada state
6  registration of the Atlantis mark for casino services, including
7  expansion to Las Vegas.  (See id. at 10.)

8      Kerzner has the better side of this dispute.  Kerzner did not
9  act unreasonably in refraining from immediately seeking declaratory
10 relief as to the parties' respective rights in Las Vegas in the
11 absence of information, or at least strong indications, that Monarch
12 was planning to expand its use of the Atlantis mark to Las Vegas in
13 the relatively near future.  Taking reasonable inferences in
14 Kerzner's favor, as we must in regard to this motion, Kerzner was
15 not aware of any such intentions on the part of Monarch until
16 Monarch contacted Kerzner in Fall 2005.[4]  "It has often been held
17 that a trademark owner who protests upon a change in an infringer's
18 use of the mark will not be barred from relief as to the new use
19 because of its silence in the face of the earlier, less harmful
20 action."  Great Basin Brewing Co. v. Healdsburg Brewing Co., 44
21 U.S.P.Q.2d 1751, 1757 (D. Nev. 1997) (citing Nat. Cable Television
22 Ass'n, 937 F.2d 1572, 1581-82 (Fed. Cir. 1991); Sun Microsystems,
23 Inc. v. SunRiver Corp., 36 U.S.P.Q.2d 1266, 1271 (N.D. Cal. 1995);

24

25     [4] Indeed, Monarch has repeatedly denied that it has ever had any
   such plans: Monarch claims that it performed some investigation of
   possibilities, but these preliminary investigations never ripened into
26 concrete plans.  (See, e.g., Aff. of John Farahi ¶¶ 8-12 (#303).)  As
   such, Monarch in one breath argues that Kerzner delayed too long to
27 bring suit, and in the next implies that the suit is not yet ripe.

28                                    23

see also <u>Grupo Gigante</u>, 391 F.3d 1088, 1103 (9th Cir. 2004) (discussing doctrine of progressive encroachment).  Moreover, the parties agree that Monarch's use of the mark in Reno is not even de minimis infringement, but non-infringing altogether.

Further, Kerzner did not, it seems, even believe that it had rights in the Atlantis mark in the United States until 2003 — hence, the intent to use application and extensions thereof it filed with the USPTO.  The Fourth Circuit's opinion in <u>International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco</u>, 329 F.3d 359 (4th Cir. 2003), was filed in May 2003.  Though we have rejected the reasoning of <u>International Bancorp</u>, it was reasonable for Kerzner for the believe for the first time in 2003 that it might have had an appropriate basis for claiming use of the Atlantis mark in the United States, and thus potentially to have a cause of action against Monarch.  Kerzner's filing of the present lawsuit less than three years after <u>International Bancorp</u> is, of course, within the four-year limitations period.  Moreover, <u>Grupo Gigante SA DE CV v. Dallo & Co., Inc.</u>, 391 F.3d 1088 (9th Cir. 2004), the case that may, as we have discussed elsewhere, entitle Kerzner to rights under the famous mark exception, was filed in December 2004, only slightly over a year before this case was filed.

It appears, therefore, that Kerzner brought suit within the applicable four-year limitations period, whether the appropriate date to start the clock is the publication of <u>Grupo Gigante</u>, the publication of <u>International Bancorp</u>, or the 2005 contact between Monarch and Kerzner regarding the matters that eventually gave rise

24

1  to this suit, after negotiations failed.[5]  A presumption against

2  laches, therefore, applies.  Having reached that intermediate

3  conclusion, however, we must still decide whether laches bars the

4  claim, taking into account while doing so the applicable

5  presumption.

6       In the trademark context, the Ninth Circuit has adopted a six-

7  factor test for determining whether laches bars a plaintiff's claim:

8  "1) the strength and value of trademark rights asserted; 2)

9  plaintiff's diligence in enforcing mark; 3) harm to senior user if

10 relief denied; 4) good faith ignorance by junior user; 5)

11 competition between senior and junior users; and 6) extent of harm

12 suffered by junior user because of senior user's delay."  E-Systems,

13 Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983) (quoting

14 Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F. Supp. 892,

15 917 (S.D.N.Y. 1968), aff'd and modified, 433 F.2d 686, 703-704 (2d

16 Cir. 1970)).  Here, our analysis is complicated somewhat in that it

17 is not entirely clear who is the senior user and who is the junior

18 user in this case — that remains to be determined by the finder of

19 fact.  Generally, however, laches is a defense asserted by junior

20 users of a mark, so it seems appropriate to treat Monarch as the

21 "junior user" and Kerzner as the "senior user" for purposes of this

22 analysis only.

23

24      [5] It must be noted, however, that Penta Hotels dates to 1988.
   See Penta Hotels Ltd. v. Penta Tours, 9 U.S.P.Q.2d 1081, 1094 (D.
25 Conn. Sep. 30, 1988).  To the extent that Kerzner relies on that case
   as a basis — however meritless — for its cause of action against
26 Monarch, Kerzner should have claimed use, not intent to use, in its
   1997 application for registration of the Atlantis mark, and it should
27 have brought suit against Monarch almost a decade before it did.

28                                    25

1    Several of the E-Systems factors weigh strongly against a
2  finding that laches bars Kerzner's claims.  Regarding the first E-
3  Systems factor, the strength and value of the mark, the Atlantis
4  mark is arbitrary, and thus is relatively strong.  See Grupo
5  Gigante, 391 F.3d at 1102.  There is also no question of the mark's
6  significant value to both parties.  Further, regarding the second
7  factor, as discussed above, Kerzner was reasonably diligent in
8  taking action to protect its mark, Monarch's arguments to the
9  contrary notwithstanding.  Similarly, the sixth factor, relating to
10 harm to the junior user, must be deemed to weigh against laches.
11 Assuming Kerzner is determined to have senior rights in the mark,
12 Monarch would have been better off if this conflict came to a head
13 in 1996, so that Monarch could have built its business around a
14 different mark.  But this harm would not be a result of Kerzner's
15 unreasonable delay in filing suit — as discussed above, taking
16 reasonable inferences in Kerzner's favor, Kerzner had no basis for
17 objecting to Monarch's use of the mark in 1996, but only in 2003 at
18 the earliest, and perhaps as late as 2005.  The record reveals no
19 additional harm to Monarch from the delay, if it may be considered
20 such, from 2003 to 2006.

21   Several other factors, however, are either neutral or weigh in
22 favor of applying laches.  It is impossible to tell at this stage
23 whether the senior user would be harmed if relief is denied: if
24 Kerzner is not entitled to trademark protections under the Grupo
25 Gigante famous marks exception, there would be no harm to Kerzner
26 for which it could be entitled to relief if relief were denied.  If
27 Kerzner's use of the Atlantis mark falls into the famous mark
28

26

1  exception, however, there would be such harm.  As such, the third E-
2  Systems factor must be deemed neutral at this stage.  The fifth E-
3  Systems factor, relating to competition between the senior and
4  junior users, is also neutral.  At the moment, any competition
5  between Monarch and Kerzner is hypothetical, arising out of a casino
6  in Las Vegas that does not yet exist.  The parties agree that their
7  existing facilities do not compete.

8       The fourth E-Systems factor, good faith ignorance of the junior
9  user, weighs somewhat in favor of applying laches.  Although Monarch
10 was probably aware of the existence of Kerzner's Atlantis in the
11 Bahamas in 1996, Monarch adopted the Atlantis mark in the belief
12 that Kerzner had no rights in the mark in the United States — at
13 least, there is no evidence to the contrary.  Moreover, it does not
14 appear that Monarch copied Kerzner in adopting the mark; rather
15 Monarch was expanding its own use of the mark from its restaurant
16 and bar to its entire facility.  These circumstances do not quite
17 amount to good faith ignorance of Kerzner's use of the mark on the
18 part of Monarch, but it is not bad faith copying, either.

19      On balance, the several factors weighing strongly against
20 laches outweigh those factors which are neutral or weigh somewhat in
21 its favor.  In conjunction with the presumption against laches
22 applicable in the circumstances of this case, such a conclusion
23 requires a finding that laches does not bar Kerzner's claims.  As
24 such, Monarch's motion (#280) will be denied.

25      D. Monarch's Motions Re. Fraud on the USPTO (## 316, 322)

26      Monarch has filed two motions for partial summary judgment that
27 deal with much the same issue, alleged fraud on the USPTO.  They are

28                                    27

1  framed differently, however, and deal with different underlying
2  facts.  The two motions are "Defendants/Counterclaimants' Motion for
3  Summary Judgment on the Issue that Kerzner's Federal Registration of
4  an Atlantis Mark for Casino Services be Cancelled for Fraud on the
5  USPTO" (#316) and "Defendants/Counterclaimants' Motion for Summary
6  Judgment on their First Counterclaim for Relief, Cancellation of
7  Kerzner's Federal Registration of an Atlantis Mark for Casino
8  Services for Fraud on the USPTO" (#322).  Kerzner has opposed (#346)
9  the motions, and Monarch has replied (## 398, 401).

10      The first of these motions (#316) is framed as relating to an
11  "issue," while the second (#322) is framed as relating to Monarch's
12  first counterclaim.  Also, the factual basis underlying the two
13  motions is different: the first (#316) focuses on the ownership
14  structure of the various Kerzner entities, while the second deals
15  with Kerzner's alleged failure to disclose to the USPTO Monarch's
16  use of the Atlantis mark.  We will first discuss the law relating to
17  claims for cancellation of trademark registrations on the basis of
18  fraud, and then we will rule on each of the two motions.

19           1.  Cancellation of Trademark Registration Standard

20      The Federal Circuit has recently clarified the law to be
21  applied to claims for cancellation of trademark registrations on the
22  basis of fraud on the USPTO.  Rather than reinvent the wheel, we
23  will quote at some length the Federal Circuit's discussion:

24          A third party may petition to cancel a registered
        trademark on the ground that the "registration was obtained
25      fraudulently."  15 U.S.C. § 1064(3).  "Fraud in procuring a
        trademark registration or renewal occurs when an applicant
26      knowingly makes false, material representations of fact in
        connection with his application."  Torres v. Cantine
27      Torresella S.r.l., 808 F.2d 46, 48 (Fed. Cir. 1986).  A

28                                  28

1       party seeking cancellation of a trademark registration for
        fraudulent procurement bears a heavy burden of proof.  W.D.
2       Byron & Sons, Inc. v. Stein Bros. Mfg. Co., 377 F.2d 1001,
        1004 (1967).  Indeed, "the very nature of the charge of
3       fraud requires that it be proven 'to the hilt' with clear
        and convincing evidence.  There is no room for speculation,
4       inference or surmise and, obviously, any doubt must be
        resolved against the charging party." Smith Int'l, Inc. v.
5       Olin Corp., 209 U.S.P.Q. 1033, 1044 (T.T.A.B. 1981).

6  In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009).

7  In In re Bose, the Federal Circuit clarified that a trademark

8  applicant commits fraud in procuring a registration only when it

9  knows that material representations of fact in its declaration are

10 false or misleading: "should know" is not enough.  Id. at 1244-45

11 (rejecting the "knows or should know" standard articulated in

12 Medinol v. Neuro Vasx, Inc., 67 U.S.P.Q.2d 1205, 1209 (T.T.A.B.

13 2003).

14       Most of a user's substantive trademark rights derive from use

15 of the mark, not registration of the mark.  See id. at 1247.  "There

16 does not exist in trademark cases the fundamental reason for being

17 on the alert to find fraud on the Patent Office which exists in

18 patent cases" because "the acquisition of the right to exclude

19 others from the use of a trademark results from the fact of use and

20 the common law, independently of registration in the Patent Office."

21 Morehouse Mfg. Corp. v. J. Strickland & Co., 407 F.2d 881, 888

22 (C.C.P.A. 1969).  For that reason, "[a]ssertions of 'fraud' should

23 be dealt with realistically, comprehending . . . that trademark

24 rights, unlike patent rights, continue notwithstanding cancellation

25 of those additional rights which the Patent Office is empowered by

26 statute to grant."  Id.

27

28                                    29

The heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to claims seeking cancellation of a registration on the basis of fraud.  See Hana Fin., Inc. v. Hana Bank, 500 F. Supp. 2d 1228, 1233 (C.D. Cal. 2007) (applying Rule 9(b) standard to pleading of alleged fraud in procurement of a trademark registration).

2. Monarch's First Motion Re. Fraud on the USPTO (#316)

Monarch's first motion regarding alleged fraud on the USPTO (#316) is premised on the circumstance that Kerzner International Resorts, Inc. ("KIRI"), the entity that filed for and was issued the '825 Registration, is not the same Kerzner entity that operates Kerzner's casino resort in The Bahamas.  That facility is operated by an entity called Paradise Enterprises Limited ("PEL"), which, like KIRI, is a subsidiary of Kerzner International Limited ("KIL"). Monarch's argument is that if any of the Kerzner entities had trademark rights in the Atlantis mark, it is PEL, and not KIRI, because KIRI never used the mark in connection with casino services. Therefore, Monarch argues, the '825 Registration should be cancelled as fraudulent, since KIRI did not disclose to the USPTO that the mark was being used by a related entity, not by KIRI itself.

The arguments raised in the present motion, based on the institutional division of labor among the Kerzner entities, were not properly pleaded in Monarch's Amended Answer and Counterclaims (#56) — arguably, they were alluded to, but they were not alleged with the specificity required by Rule 9(b).  Nor has Monarch filed any motion for leave to amend.  The addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to

1  amend the complaint.  Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir.
2  1994) (citing Roberts v. Az. Bd. of Regents, 661 F.2d 796, 798 n.1
3  (9th Cir. 1981)).  Four factors are relevant to the determination of
4  a motion for leave to amend: "bad faith, undue delay, prejudice to
5  the opposing party, and the futility of the amendment."  Id.  There
6  is a strong policy in favor of allowing amendment.  See Fed. R. Civ.
7  P. 15(2) ("The court should freely give leave when justice so
8  requires.")

9      Here, however, it does not appear that justice requires Monarch
10 to be allowed to amend its pleadings to add this issue to the case;
11 quite the opposite.  This action has been pending for nearly four
12 years, and the present motion is apparently the first time the issue
13 has been raised.  The deadlines for amendment of pleadings, for
14 conducting discovery, and for the filing of dispositive motions have
15 all long since passed.  As such, there would be significant
16 prejudice to Kerzner by the addition of the issue at this late date.
17 Monarch has suggested that it only learned of the basis for its
18 arguments in the present motion in January 2008, when Kerzner
19 produced the Bahamian gaming licenses for its facility in the
20 Bahamas.  This argument strains credulity: it seems likely that
21 Monarch knew more than enough about the corporate relationships of
22 the Kerzner entities to raise the issue of which of them is properly
23 considered the owner of the Atlantis mark long before January 2008.
24 In any case, however, even in January 2008, Monarch filed no motion
25 for leave to amend its pleadings — instead, it delayed until July
26 2009, when it filed its motions for summary judgment, to raise the
27 issue.  As such, because of both prejudice to Kerzner and Monarch's

28                                31

1 undue delay, we decline to treat Monarch's raising of new arguments
2 in the present motion for summary judgment as a motion for leave to
3 amend.

4     Our decision here is based on the procedural matters just
5 discussed.  It is worth noting, however, that Monarch's arguments
6 also fail on the merits.  There is no basis for concluding as a
7 matter of law that Kerzner knew that its statements to the USPTO
8 about KIRI using the mark were false.  Taking inferences in
9 Kerzner's favor, when Kerzner filed its Statement of Use with the
10 USPTO, Kerzner was operating under a good faith belief that KIRI's
11 activities using the mark counted as use under either <u>Penta Hotels</u>
12 or <u>International Bancorp</u>.  Even though we have rejected Kerzner's
13 arguments under those cases, Kerzner would have had to know that we
14 would do so for its representations to the USPTO to constitute fraud
15 under the standard articulated in <u>In re Bose</u>.

16     In addition, there is at least some evidence that KIRI controls
17 PEL's use of the Atlantis mark.  It is the longstanding practice of
18 the USPTO to accept applications by parties claiming ownership of
19 marks "through use by controlled licensees, whether the control over
20 the nature and quality of the goods and services rendered under the
21 mark results from a corporate relationship or from a contract."
22 <u>Pneutek, Inc. v. Scherr</u>, 211 U.S.P.Q. 824, 833 (T.T.A.B. 1981).  At
23 least in one unpublished case, the Trademark Trial and Appeal Board
24 has found that "neither use of the mark solely by an applicant's
25 licensee nor applicant's failure to indicate such use, affects
26 applicant's ownership rights herein."  <u>Sports Auth. Mich., Inc. v.</u>
27 <u>Kalle</u>, 2002 TTAB LEXIS 252, at *9 (T.T.A.B. Mar. 29, 2002).

28

In short, Monarch's motion (#316) will be denied on the basis that the issues contained therein were not pleaded with specificity as required by Rule 9(b) and no motion for leave to amend was filed in a timely manner.  We decline to treat the addition of these new issues in Monarch's motion (#316) as a motion for leave to amend because of the undue delay on the part of Monarch, as well as the prejudice to Kerzner that would ensue if we were to do otherwise.

### 3. Monarch's Second Motion Re. Fraud on the USPTO (#322)

Monarch argues in its second motion (#322) for cancellation of the '825 Registration that Kerzner's application for registration was fraudulent in several respects.  First, Monarch asserts that Kerzner knew when it filed its application that Monarch was already operating its casino in Reno under that same mark.  As such, Monarch argues, Kerzner was obligated to disclose this circumstance to the USPTO, and because it did not do so, the '825 Registration should be cancelled for fraud.  Second, Monarch argues that Kerzner fraudulently claimed that it provided casino services in the United States, when in fact it has never done so.  Finally, Monarch makes much of the circumstance that Kerzner filed its Statement of Use with the USPTO on the last possible day before the expiration of the last allowable extension of its 1997 intent to use application. Monarch notes that Kerzner admits that no material facts had changed regarding use of the mark, but whereas Kerzner had previously denied any actual use, it suddenly claimed use of the mark dating back to October 1994.  Monarch argues that these circumstances indicate that Kerzner filed its statement of use because it was seeking to avoid

33

abandonment of the mark, rather than because it actually had used the mark.

Monarch's first argument, relating to failure to disclose to the USPTO Monarch's operation of a casino in Reno under the Atlantis mark, focuses on a written statement made by Howard Karawan, then Senior Vice President of KIRI, in support of Kerzner's initial intent to use application:

> [T]o the best of my knowledge and belief, no other person, firm, corporation or association has the right to use the above-identified mark in commerce, either in identical form thereof or in such near resemblance thereto as to be likely, when applied in connection with the goods/services of such other person, firm, corporation or association to cause confusion, or to cause mistake, or to deceive . . . .

(Application for Service Mark Registration, Feb. 14, 1997 (#328-18 at 8).)

It must first be noted that Kerzner's arguments in opposition are not entirely valid.  Mr. Karawan's statement only disclaims knowledge of use by one who "has the right to use" the Atlantis mark.  Kerzner now argues that Mr. Karawan's statement was true because only Kerzner, not Monarch, has the right to use the Atlantis mark in commerce.  This argument, however, ignores the circumstance that from 1997 to 2003, Kerzner apparently did not believe that it had used the mark in the United States beginning in 1994 — otherwise, the application for trademark registration would have been filed on the basis of actual use, rather than intent to use. As such, this argument by Kerzner depends on an anachronism, and is rejected.

1    Nevertheless, Monarch's argument that Kerzner knew that Mr.
2  Karawan's statement on its behalf was false fails because, as the
3  parties have agreed, Monarch's use of the Atlantis mark in Reno
4  causes no likelihood of confusion with Kerzner's use of the mark in
5  The Bahamas.  There is no clear and convincing evidence in the
6  record that Kerzner believed otherwise in 1997, when the statement
7  quoted above was made.  As such, the statement was true: even if Mr.
8  Karawan knew of Monarch's operations in Reno, it does not follow
9  that he knew of a party using the Atlantis mark in such a way as
10  would cause consumer confusion.  Thus, Monarch has not demonstrated
11  fraud on the USPTO under the standard articulated in In re Bose.

12    Monarch's second argument is based on the circumstance that
13  Kerzner has never provided casino services under the Atlantis mark
14  within the United States, either before or after obtaining the '825
15  Registration.  Monarch argues on this basis that Kerzner's 2003
16  Statement of Use was false, and that Kerzner knew it was making
17  false representations to the USPTO.[6]  We disagree.

18    Monarch's argument depends on the notion that Kerzner's use of
19  the Atlantis mark in The Bahamas could not give rise to trademark
20  rights within the United States.  But Kerzner had reasonable grounds
21  for claiming use in commerce under the Lanham Act in 2003 —
22  Kerzner's arguments based on Penta Hotels and International Bancorp

23

24

25    [6] Monarch also raises again the arguments based on the
   institutional division of labor between the various Kerzner entities.
26  Those arguments are again rejected on the same basis as discussed
   above in relation to Monarch's first motion regarding fraud on the
27  USPTO (#316).

28
                                    35

are facially plausible, though we have elsewhere rejected them.[7]  At most, the evidence in the record requires the conclusion that Kerzner's representations to the USPTO may have been based on mistaken understandings of trademark law — in other words, the statements may have been false, and perhaps Kerzner even should have known they were false.  But there is no clear and convincing evidence that Kerzner knew that the statements were false.  Under the high standard articulated in <u>In re Bose</u>, that is not enough.

Monarch's third argument, based on the filing date of Kerzner's 2003 statement of use, essentially consists of the following syllogism: (1) Kerzner's Statement of Use was filed on the last possible day; (2) Kerzner admits that no material facts had changed between the time of Kerzner's previous intent to use application and extensions thereof, and its final claim of actual use dating back to October 1994; so therefore (3) Kerzner filed its Statement of Use not because it believed it had actually used the mark, but only to avoid abandonment of the intent to use application.

Monarch's argument fails because the conclusion in (3) does not necessarily follow from the two premises.  The date on which the Statement of Use was filed is simply irrelevant to the question of whether Kerzner knew the contents of that statement were false.  At

---

[7] The circumstance that <u>Penta Hotels</u> predates the initial intent to use application is less relevant in this inquiry than it was in the laches context, mentioned above, because the standards are different. Laches examines whether there was an unreasonable delay in filing suit, whereas the fraud inquiry examines the state of mind of the speaker of the alleged misrepresentation at the time the statement was made.  Kerzner did not waive the opportunity to later reevaluate old precedent and claim actual use to the USPTO, just because the initial application was brought on an intent to use basis.

best, it is grounds for speculation or inference as to Kerzner's motives, which is not enough to support cancellation of Kerzner's registration on the basis of fraud under In re Bose.  Moreover, though the material facts had not changed between 1997 and 2003, the legal framework that provides meaning to those facts had changed. International Bancorp gave Kerzner a new basis for claiming actual use of the mark, though its casino was located abroad.  Grupo Gigante would not be published for another year, but it would later provide a second basis for such a claim.  Kerzner's attorneys may even have reexamined the legal precedent in light of the upcoming expiration of the intent to use application, and come to the conclusion that Penta Hotels provided a legitimate basis for claiming actual use — though we have rejected that argument elsewhere, it is not entirely implausible or frivolous.

     Thus, Kerzner may well have believed its representations to the USPTO were true, even if they should turn out in the course of this litigation to have been false.  There is no clear and convincing evidence in the record that is sufficient to support the contrary conclusion.  As such, Monarch's motion (#322) will be denied.

     E. Kerzner's Motion for Partial Summary Judgment (#325)

     Kerzner's motion (#325) for partial summary judgment seeks entry of summary judgment in Kerzner's favor on Kerzner's remaining claims for declaratory judgement, brought pursuant to Lanham Act Sections 32(1) and 43(a), as well as the common law of trademark and unfair competition.  Kerzner also seeks summary judgement on certain of Monarch's counterclaims: Monarch's first counterclaim for cancellation of the '825 Registration on the basis of fraud;

37

Monarch's fourth counterclaim for trademark infringement; Monarch's fifth counterclaim for "declaratory relief that counterclaimants have developed common law rights in an Atlantis mark for Casino Services"; Monarch's sixth counterclaim for "declaratory relief that counterclaimants own a valid Nevada State Trademark for Casino Services under N.R.S. § 600.050 et seq"; and Monarch's seventh counterclaim for "declaratory relief pursuant to claim for trademark infringement under NRS § 600.050 et seq."  Kerzner further requests that the Court enter a permanent injunction enjoining Monarch from using the Atlantis mark in connection with a casino in Las Vegas, among other things.

As discussed above, there is no clear and convincing evidence in the record that Kerzner knew that its representations to the USPTO in its 2003 Statement of Use were false.  For the same reasons discussed in relation to Monarch's motions (##316, 322) addressing that issue, Kerzner is entitled to summary judgment on Monarch's first counterclaim.

There remains a genuine issue of material fact regarding when, if ever, Kerzner's mark acquired a sufficient level of consumer recognition in the Las Vegas market so as to fall under the Grupo Gigante famous marks exception.  The resolution of that issue is necessary before judgment as a matter of law could be appropriate on any of the parties' claims or counterclaims for trademark infringement or for declaratory judgment about the parties' own rights in the Atlantis mark.  As such, Kerzner's motion will be denied with regard to Kerzner's claims and Monarch's fourth, fifth, and seventh counterclaims.

38

1    We have already granted in part and denied in part Monarch's
2 motion (#278) for summary judgment regarding Monarch's state
3 registration of the Atlantis mark.  Monarch's state registration is
4 valid and enforceable as a matter of Nevada law.  That state
5 registration does not, however, necessarily entitle Monarch to use
6 the Atlantis mark throughout Nevada, because Kerzner may have
7 federal rights that would preempt those state rights.  Kerzner's
8 motion, therefore, regarding Monarch's sixth counterclaim for
9 declaratory relief that Monarch owns a valid Nevada state trademark
10 for casino services, will be granted in part and denied in part on
11 the same basis.

12    Because Kerzner is not, for the most part, entitled to summary
13 judgment on the issues raised in its motion (#325), including most
14 importantly the parties claims and counterclaims for infringement,
15 issuance of the permanent injunction that Kerzner requests would be
16 inappropriate.

17

18                    **IV. Conclusion**

19    Several of the pending evidentiary motions are moot because the
20 evidence to which one of the parties has objected makes no
21 difference in the disposition of the pending motions for summary
22 judgment.  Thus, the Hall & Partners report, Ms. Burrell's
23 affidavit, and the various pieces of evidence to which Monarch
24 objected in its motion (#376) to strike certain exhibits were not
25 considered, and the motions to exclude them are moot.  Further, Dr.
26 Samuel's testimony will be excluded from trial, because it is for
27 the most part irrelevant and cumulative of the instructions the
28                         39

1    Court will give to the jury; to the extent his opinions may have
2    some probative value, it would likely be more confusing than
3    helpful.  Dr. Jacoby's expert opinion will not be excluded, because
4    it is relevant to matters at issue in the case and his methodology,
5    though it may be subject to effective cross examination, was not so
6    flawed as to warrant exclusion from evidence.

7        Regarding the pending motions for summary judgment, Monarch's
8    state registration of the Atlantis mark is valid and enforceable as
9    a matter of state law.  This circumstance, however, does not mean
10   that Monarch automatically has exclusive rights in the mark within
11   Nevada, under federal law.  Further, Kerzner's claims are not barred
12   by laches, nor is there any clear and convincing evidence in the
13   record of fraud on the USPTO that would justify cancellation of the
14   '825 registration.  There remains a genuine issue of material fact
15   as to when, if ever, Kerzner's use of the Atlantis mark qualified
16   for trademark protections under the famous mark exception.  Thus,
17   summary judgment on the parties' claims and counterclaims relating
18   to trademark infringement and their respective rights in the
19   Atlantis mark would not be appropriate.

20

21       **IT IS, THEREFORE, HEREBY ORDERED** that Kerzner's "Motion in
22   Limine to Exclude the Opinions and Testimony of Defendants'
23   Purported Expert Jeffrey M. Samuels" (#340) is **GRANTED**.

24

25       **IT IS FURTHER ORDERED** that Monarch's "Motion to Exclude Expert
26   Report and Testimony of Jacob Jacoby" (#345) is **DENIED**.

27

28                                    40

1    **IT IS FURTHER ORDERED** that Monarch's "Motion in Limine to
2 Exclude Report of Purported and Undisclosed Expert Hall & Partners"
3 (#364) is **DENIED** as moot.

4

5    **IT IS FURTHER ORDERED** that Monarch's "Motion to Strike a Number
6 of Plaintiffs [sic] Exhibits to Plaintiffs' Motion for Partial
7 Summary Judgment (#376) is **DENIED** as moot.

8

9    **IT IS FURTHER ORDERED** that Kerzner's "Motion to Strike
10 Affidavit of Laraine M. I. Burrell" (#395) is **DENIED** as moot.

11

12    **IT IS FURTHER ORDERED** that Monarch's "Motion for Partial
13 Summary Judgment that Plaintiffs Cannot Assert their Federal
14 Trademark Registration No. 2,810,825 for Atlantis to Enjoin
15 Defendant/Counterclaimant's use of the Atlantis Mark for Casino
16 Services" (#278) is **GRANTED IN PART and DENIED IN PART** on the
17 following basis:

18        (1) Monarch commenced use of the Atlantis mark for casino
19        services prior to Kerzner's application for federal trademark
20        registration that eventually resulted in the issuance of the
21        '825 Registration;
22        (2) Monarch's use of the Atlantis mark in commerce for casino
23        services has been continuing and uninterrupted from April 1996
24        to the present;
25        (3) Kerzner's constructive use of the Atlantis mark under 15
26        U.S.C. § 1057(c), conferring a right of priority, nationwide in

27

28                                    41

1   effect, dates to the filing of its intent to use application in
2   February 1997; and
3   (4) the Court's ruling in (3) has no bearing on what rights in
4   the Atlantis mark, if any, Kerzner may have acquired though
5   actual use of the mark prior to February 1997.
6
7   **IT IS FURTHER ORDERED** that Monarch's "Motion for Summary
8   Judgment on the Defense of Laches" (#280) is **DENIED**.
9
10   **IT IS FURTHER ORDERED** that Monarch's "Motion for Summary
11   Judgment on the Issue that Kerzner's Federal Registration of an
12   Atlantis Mark for Casino Services be Cancelled for Fraud on the
13   USPTO" (#316) is **DENIED**.
14
15   **IT IS FURTHER ORDERED** that Monarch's "Motion for Summary
16   Judgment on their First Counterclaim for Relief, Cancellation of
17   Kerzner's Federal Registration of an Atlantis Mark for Casino
18   Services for Fraud on the USPTO" (#322) is **DENIED**.
19
20   **IT IS FURTHER ORDERED** that Kerzner's "Motion for Partial
21   Summary Judgment" (#325) is **GRANTED IN PART and DENIED IN PART** on
22   the following basis:
23   (1) The motion is granted with respect to Monarch's first
24   counterclaim for cancellation of the '825 Registration on the
25   basis of fraud.
26   (2) The motion is denied with respect to Kerzner's claims and
27   Monarch's fourth, fifth, and seventh counterclaims.
28
42

1     (3) The motion is granted in part and denied in part with

2     respect to Monarch's sixth counterclaim, on the same basis as

3     discussed above with regard to Monarch's motion (#278)

4     regarding Monarch's state registration of the Atlantis mark.

5     (4) Kerzner's request for a permanent injunction is denied.

DATED: December 14, 2009.

_____
UNITED STATES DISTRICT JUDGE

43